**Melissa LUDTKE and Time,
Inc., Plaintiffs,**

v.

**Bowie KUHN, Commissioner of Baseball, Leland MacPhail, President of the American League of Professional Baseball Clubs, the New York Yankees Partnership, The Mayor of the City of New York, The Commissioner of Parks and Recreation for the City of New York, and the Director of the Economic Development Administration of the City of New York, Defendants.**

No. 77 Civ. 6301.

United States District Court,
S. D. New York.

Sept. 25, 1978.

Frederick A. O. Schwarz, Jr., Calvin R. House, Catherine M. Raymond, Cravath, Swaine & Moore, New York City, for plaintiffs.

Jesse Climenko, Thomas A. Andrews, Martin E. Karlinsky, Steven E. Levitsky, Shea, Gould, Climenko & Casey, New York City, for defendants.

## OPINION ON MOTION FOR SUMMARY JUDGMENT

MOTLEY, District Judge.

### Preliminary Statement

This is a civil rights action for an injunction brought by plaintiff, Melissa Ludtke, a female reporter employed by Sports Illustrated, a magazine published by the other plaintiff, Time, Inc.[1] Plaintiffs seek an or-

---

1. Plaintiffs rely on Title 42 U.S.C. § 1983 and invoke the jurisdiction of the court pursuant to Title 28 U.S.C. § 1343.

der enjoining defendants, The New York Yankees, from enforcing a policy determination made by Baseball Commissioner Kuhn, and approved by American League President MacPhail, which requires that accredited female sports reporters be excluded from the locker room of the Yankee clubhouse in Yankee Stadium. Defendants admit that accredited male sports reporters may enter the locker room after a ball game for the purpose of interviewing ballplayers and that such fresh-off-the-field interviews are important to the work of sports reporters. The defendants are: Bowie Kuhn, Commissioner of Baseball; Leland MacPhail, President of the American League of Professional Baseball Clubs; The New York Yankees Partnership (the baseball defendants); The Mayor of the City of New York; The Commissioner of Parks and Recreation for the City of New York; and The Director of the Economic Development Administration of The City of New York (the City defendants).

The action was commenced on December 29, 1977. The baseball defendants answered on January 26, 1978, and the City defendants answered on March 10, 1978. Thereafter, on March 17, 1978, plaintiffs moved for summary judgment followed by a cross-motion for summary judgment by the baseball defendants on April 6, 1978. The summary judgment motions came on for hearing on April 14, 1978. At that time the City defendants filed an affidavit in opposition to plaintiffs' motion for summary judgment against the City defendants urging that the motion be denied and the complaint dismissed as to them on the ground that the City defendants are unnecessary parties, since complete relief can be afforded plaintiffs by an order directed solely to the baseball defendants. The City defendants denied any participation in the policy determination at issue and agreed with plaintiffs that a less restrictive alternative to the policy of total exclusion of female reporters ought to be devised and so advised the baseball defendants and their attorneys prior to the hearing. Plaintiffs do not charge the City defendants with responsibility for the policy determination. Plaintiffs charge, and the undisputed facts show, the policy was a result of a decision made by the Baseball Commissioner, approved by the American League President, and enforced by the New York Yankees. The City was charged in the complaint solely with failure to redress plaintiffs' grievance against the baseball defendants, although it has the power to do so under the terms of its lease whereby it has leased the City owned facility known as Yankee Stadium to the Yankees. The motion was granted on the ground that the City defendants were unnecessary parties at this time.[2]

In addition to seeking an injunction, plaintiffs sought damages and attorneys fees. No monetary damages have been alleged or proved and the plaintiffs have advised the court that they have abandoned their request for damages.[3] Attorneys fees may be awarded upon submission of evidence of the time expended by plaintiffs' counsel and after a separate hearing with respect to the fee requested.

In support of their motion for summary judgment, plaintiffs submitted the required Rule 9(g) Statement pursuant to the General Rules of this Court. In opposition defendants also submitted a Rule 9(g) Statement claiming that there are genuine issues as to certain facts contained in plaintiffs' Statement. However, other than simply claiming that an issue is controverted, or denying knowledge or information sufficient to admit or deny a statement, no facts actually controverting plaintiffs' statement of material facts were offered as required by Rule 56(e), Fed.R.Civ.P.[4]

2. See transcript of oral argument, April 14, 1978, at pp. 3–5.

3. Letter to the court from Mr. Frederick A. O. Schwarz, Jr., dated April 29, 1978.

4. Rule 56(e) provides, in pertinent part, that: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his

Defendants' attorney brought to the court's attention on the hearing of the motions for summary judgment that efforts had been made prior to the hearing to reach an accord with all parties. Defendants' counsel charged plaintiffs with bad faith in bringing this lawsuit and with respect to all reasonable settlement suggestions. Plaintiffs' counsel denied that plaintiffs were guilty of bad faith in bringing this action and expressed a willingness to reach an accord as to equal access by women reporters to ballplayers in the Stadium at the same time that such access is accorded male reporters.

At the close of the hearing, and without deciding the issue of good faith, the parties were directed to attempt to reach agreement on some other arrangement which would result in equal access to ballplayers by both male and female sports reporters. Thereafter, on May 8, 1978, the court was advised by plaintiffs' counsel that no settlement could be reached.

The court was therefore required to decide whether the Kuhn policy determination constitutes state action within the contemplation of the Fourteenth Amendment to the Federal Constitution and, if so, whether it violates 1) plaintiff Ludtke's right to the equal protection of the laws guaranteed by that Amendment, 2) the right of both plaintiffs to freedom of the press guaranteed by the First Amendment via the due process clause of the Fourteenth Amendment, or 3) plaintiffs' rights under the state's equal accommodations statute.[5]

### The Facts

The court finds that there is no genuine issue as to any material fact and that plaintiffs are entitled to judgment as a matter of law. The undisputed facts, as set forth by the plaintiffs in their 9(g) Statement, and not seriously controverted by defendants, are as follows:

response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

On April 2, 1975, defendant Bowie Kuhn wrote the general managers of all major league baseball teams indicating that baseball should maintain a "unified stand" against the admission of women sportswriters to major league clubhouses.

During the 1977 World Series that policy was applied to plaintiff Melissa Ludtke, a sportswriter for Sports Illustrated, a weekly sports magazine published by plaintiff Time Incorporated.

After the 1977 World Series and after the commencement of this action, baseball reconfirmed its policy of excluding women reporters from the clubhouse.

Kuhn's 1975 "unified stand" letter followed discussions within the Office of the Commissioner triggered by the decision of the National Hockey League All-Star teams to allow women reporters to conduct interviews in the locker rooms following the January 1975 National Hockey League All-Star Game.

In the course of those discussions, the Commissioner's office questioned no baseball players concerning their opinions. Public relations directors of the major league teams were questioned and their opinions were varied.

On July 22, 1976, Robert Wirz, Director of Information of the Office of the Commissioner of Baseball, wrote the Public Relations Directors of all Major League Baseball teams a reminder of baseball's stance in opposition to allowing women reporters access to clubhouses and asking whether any women had requested such access.

On August 4, 1976, by letter, and shortly thereafter orally, the public relations director of defendant New York Yankees told Mr. Wirz that the Yankee players had concluded by an "overwhelming majority" that women could be allowed access to the clubhouse if they conducted themselves professionally.

5. The court does not reach plaintiffs' free press and state law claims in this case, as it has been found possible to afford the parties complete relief on the basis of their other claims. See discussion, infra, relating to equal protection and due process.

Mr. Wirz then told the Yankee public relations director that action by one team to allow women reporters in the clubhouse would be a "definite threat to breaking down the overall barrier".

Thereafter, Yankee management reversed the position of the players and said "no more" to women reporters in the Yankee clubhouse.

At the 1977 Baseball World Series games between the New York Yankees and the Los Angeles Dodgers, Melissa Ludtke, an accredited reporter assigned by Sports Illustrated to cover the Series, was informed by the Commissioner's office that she was not permitted, solely on the basis of her sex, to enter either team's clubhouse after the Series games. The Commissioner's office was aware that the Dodgers had already told Ludtke that she would have access to their clubhouse after the games. The Commissioner's office was also aware that Ludtke had been given access to the manager's office in the Yankees' clubhouse during the American League playoff games.

The Commissioner's office assigned Larry Shenk, the public relations director for the Philadelphia Phillies, to try to bring players out of the clubhouse to speak with Ludtke in the tunnel where she was made to stand. Shenk subsequently stated at the 1977 annual major league public relations meeting, chaired by the Commissioner's Director of Information, that women reporters should be given postgame access to the clubhouse.

During the World Series, the Commissioner was also told by Henry Hecht, a baseball writer for the New York Post, that he and other "regular writers on the beat" thought that women reporters should be given equal access to teams' clubhouses.

The Commissioner's office spoke to no players concerning their views either during or after the World Series. After the commencement of this action, in January 1978 and again in March, the Commissioner reconfirmed his policy of excluding women reporters from baseball clubhouses.

Leland MacPhail, the President of the American League, has stated that he supports the Commissioner's policy regarding women reporters.

In March 1978, at the Yankees' spring training camp in Fort Lauderdale, Florida, the Yankees' manager gave one or more women journalists access to the Yankees' locker room. Shortly thereafter the Yankees were instructed that they were to comply with the Commissioner's policy, and the Yankees' manager stated that women reporters would be excluded from the clubhouse once the regular season began.

The Annual Notice issued to all major league baseball teams by the Office of the Commissioner of Baseball has, since at least 1974, stated that access to clubhouses "should" be granted to accredited members of the media.

The World Series Manual issued by the Commissioner's Office for the World Series provides that the clubhouses will be opened to the press within five minutes of the close of each game except after the final game when they will be opened immediately.

Although the Notices and Manual on their face grant access to accredited reporters without regard to their sex, the Commissioner's Office takes the position that the Commissioner's letter of April 2, 1975, adds a prohibition based upon sex to those Notices and Manual.

When confronted with situations in which individual players have refused to make themselves available to accredited reporters in clubhouses after major league baseball games, the Office of the Commissioner has urged the clubs of which those players are members to make such players available.

A significant portion of the news written about baseball emanates from news gathered by male reporters in the clubhouses of professional baseball teams.

The current president and a former president of the Baseball Writers Association of America indicated to Commissioner Kuhn and his Director of Information during the 1977 World Series that part of their "function" as professional baseball writers was to interview players in the clubhouse.

By definition, female reporters who are excluded from baseball clubhouses are not given the same access to the news and newsmakers as their male colleagues and competitors. This denial of equal access places female reporters at a severe competitive disadvantage because they miss stories witnessed or heard by male reporters inside the clubhouse, because they are unable to take advantage of the group questioning inside the clubhouse and because they are unable to talk to some players at all.

Professional hockey teams began to admit accredited female reporters to their locker rooms at the National Hockey League All Star Game in the winter of 1975.

Professional basketball teams began to admit accredited female reporters to their locker rooms in the spring of 1975.

As of today, of the 22 teams in the National Basketball Association, all but two or three admit accredited female reporters, including both New York area teams.

As of today, approximately 14 of the 18 teams in the National Hockey League, including the New York Rangers, give female reporters access to their locker rooms. The Office of the Commissioner was informed by an official of the National Hockey League in January 1978 that "about half" of the NHL teams allowed women reporters into their locker rooms.

Accredited female reporters have also been given access to the locker rooms of, for example, the New York Cosmos professional soccer team, the Minnesota Vikings professional football team and the University of San Francisco basketball team.

Women reporters who have been given access to locker rooms in other sports have found that a substantial portion of their material comes from the locker room and thus that access to the locker room is an important part of their job. They are able to compete fully with the male reporters on their beat because they are given equal access to the news and the newsmakers.

The New York Yankees' clubhouse is divided into nine separate rooms, i. e., the central locker room area which contains cubicles for each player; the manager's office; the players' lounge; the trainer's room; a doctor's office; a sauna; a washroom which contains several individual sinks; a room containing the toilets; and the shower room which includes adjoining drying areas.

Male reporters have traditionally been granted access only to the central locker room area and the manager's office.

The shower and toilet facilities are completely hidden from any view from the locker room. Swinging doors could easily be placed in the doorway which leads into the adjacent washroom.

The individual player cubicles in the central locker room area are approximately four feet wide and three feet deep and a player can comfortably dress in the cubicle. A curtain could be hung across the cubicle's one open side.

Plaintiff Time Incorporated, is engaged in the communications business and publishes magazines including Sports Illustrated. A significant portion of Time's business involves sports coverage.

After two years of experience as a junior baseball reporter for Sports Illustrated, plaintiff Ludtke was assigned by the magazine to attend and report on the 1977 World Series games.

Defendant Bowie Kuhn is the Commissioner of Baseball, who claims and has been given authority by the New York Yankees to make decisions about access to the clubhouses in Yankee Stadium, and by the American and National Leagues to make decisions about access to the clubhouses of other major league baseball teams.

Defendant MacPhail is the President of the American League of Professional Baseball Clubs.

Defendant New York Yankees Partnership is an Ohio Limited partnership and has an office in Yankee Stadium, Bronx, New York. The Yankees are a member of the American League, and together with the American League are a party to the Major League Agreement, which created the Office of the Commissioner of Baseball.

92

The City acquired title to Yankee Stadium and the land surrounding it by exercise of its power of eminent domain upon a factual showing, approved by the Supreme Court of the State of New York, Bronx County, that purchase of Yankee Stadium was required for a "public use".

The City was authorized to lease the Stadium to the Yankees, rather than to the highest bidder, by a New York State statute which found that:

".  .  . Yankee Stadium is important to the cultural, recreational and economic vitality of the state and city; .  . and that unless the stadium and its supporting facilities are substantially renovated and modernized it is likely that the New York Yankees, the New York Giants and other stadium users will transfer to a location outside the state and the city. .  .  ." Chapter 986 of McKinney's 1971 Session Laws of New York.

Pursuant to the State authorization, on August 8, 1972, the City and the New York Yankees entered into a 30-year lease which gives the Yankees extensive control over the entire stadium and exclusive control year round over their clubhouse.

The entire stadium, including the clubhouses, was renovated at a cost to the City of approximately $50 million in time for use by the Yankees during the 1976 baseball season.

In both 1976 and 1977 the Yankees' obligation for rent due the City was approximately $1 million, as required under a percentage formula whereby the amount paid to the City increases as attendance increases. Accordingly, the City has a stake in increasing attendance at games at Yankee Stadium, and in its lease recognizes the connection between publicity and increased attendance.

New York City police are on duty at the sporting events held in Yankee Stadium.

The Yankees are required under the lease to comply with all present and future federal, state and local laws affecting their operations at Yankee Stadium, and the City retains the right to enforce and assure compliance not only with local but also federal and state laws.

## THE LAW

Central to the resolution of this case is the undisputed fact that all accredited female sports reporters are excluded from the Yankee clubhouse at Yankee Stadium solely because they are women, whereas, all accredited male sports reporters (to the extent that space limitations permit) are permitted access to the clubhouse after games for the purpose of interviewing ballplayers.

Defendants say women reporters are excluded in order 1) to protect the privacy of those players who are undressed or who are in various stages of undressing and getting ready to shower; 2) to protect the image of baseball as a family sport; and 3) preservation of traditional notions of decency and propriety.

Another pivotal fact which is also not disputed is that fresh-off-the-field interviews are important to the work of sports reporters and will give a competitive advantage to those who have access to the ballplayers at that juncture, particularly during the World Series games.

Another critical consideration is the admission that there are several other less sweeping alternatives to the present policy of blanket exclusion of women reporters. Counsel for defendants admitted that those players who are desirous of undressing can retreat to their cubicles in the clubhouse. There the players can be shielded from the "roving eyes" of any female reporters by having each cubicle furnished with a curtain or swinging door. It is also conceded that the player who is undressed and wishes to move about in that state can use a towel to shield himself from view.

Since the Kuhn policy determination is based solely on sex, and since that policy results in denial of equal opportunity to plaintiff Ludtke to pursue her profession as a sports reporter, and since there are several less restrictive alternatives to the total exclusion of women, and since the material facts regarding New York City's involve-

ment in Yankee Stadium and the lease of those premises to the Yankees are not disputed, the only questions remaining for decision are questions of law.

### A. State Action

The first question is whether New York City's involvement with Yankee Stadium and the lease arrangement with the Yankees is such as to make the Kuhn policy determination state action within the contemplation of the Fourteenth Amendment.

It must by now be regarded as well settled that state action may be found where the direct perpetrator of allegedly discriminatory acts is, though a private entity, "so entwined" with an agency of the state that that agency must be deemed responsible for the private entity's acts. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). There is, however, no rigid yardstick against which the relationship may be measured to determine the presence of state action. As the Supreme Court has explained:

> Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance. *Burton, supra,* at 722, 81 S.Ct. at 860.

*Burton,* like the instant case, involved discrimination against the plaintiff on the ground of a class-based characteristic, in that case race. The discrimination there took place on ostensibly private premises (those of the defendant Eagle Coffee Shoppe), operated under lease from a public authority (the Wilmington Parking Authority). Here the discrimination also takes place on ostensibly private premises (the Yankee Clubhouse) located on premises (Yankee Stadium) operated under lease from a public authority (The City of New York). The Court in *Burton* found that the coffee shop, located in an otherwise public building owned by the Wilmington Parking Authority, enjoyed a "symbiotic relationship" with the publicly operated portions of the premises, consisting of parking facilities. The proximity of the coffee shop was

found to be essential in establishing the fiscal viability of the parking garage. 365 U.S. at 718, 81 S.Ct. 856. The Yankee clubhouse in this case has been opened to the press immediately after games, particularly during the World Series, so that players fresh-off-the-field may be interviewed. Moreover, it is undisputed that television cameras were permitted in the clubhouse after the World Series games for the same purpose. Advertising and massive publicity about the Yankees and individual Yankee ballplayers is essential to the profitability of the Yankee Stadium.

The *Burton* Court drew particular attention to the fact that:

> . . . [T]he commercially leased areas were not surplus state property, but constituted a physically and financially integral and, indeed, indispensable part of the State's plan to operate its project as a self-sustaining unit. Upkeep and maintenance of the building, including necessary repairs, were responsibilities of the Authority and were payable out of public funds. It cannot be doubted that the peculiar relationship of the restaurant to the parking facility in which it is located confers on each an incidental variety of mutual benefits. 365 U.S., at 723–724, 81 S.Ct., at 861.

The facts of the case at hand so nearly resemble those of *Burton* that there can be little doubt that state action exists here, making 42 U.S.C. § 1983 an appropriate statute for plaintiffs to employ in seeking redress of the injuries flowing from the defendants' discriminatory conduct, and vesting this court with jurisdiction.

Here, as in *Burton,* the place where the discriminatory acts occurred is owned by the state (the City of New York) and leased pursuant to special legislative provisions to the Yankees. In this case, as in *Burton,* the facility involved is maintained and improved with the use of public funds. The Court noted in *Burton* that the relationship of the public and private entities in that case placed them in a relationship of interdependence. The same observation can be made on these facts, where the annual rent-

als to be paid to the City for use of the stadium depend directly on the drawing power of Yankee games, and the City has in turn invested substantial sums of public money to enhance that drawing power by modernizing and improving the stadium itself.

In defendants' memorandum in opposition to plaintiffs' motion for summary judgment and in support of their own cross-motion, they set forth the objectives underlying baseball's policy of excluding female reporters from the locker room. Among these conceded objectives were the aim "to protect and preserve the national image of baseball as a family game . . . and . . . to preserve baseball's audience and to maintain its popularity and standing." (Defendants' Memorandum at 38.)

It is an undisputed fact that the City's profit from its lease with the Yankees escalates when attendance at Yankee games increases. Thus the City has a clear interest in the preservation and maintenance of baseball's audience, image, popularity and standing.

Furthermore, the City has not stepped in, pursuant to the lease provision requiring the Yankees to comply with all local, state, and federal laws, to stop the Yankees' discriminatory conduct. This is so despite the City's indication of its conviction "that a less restrictive alternative to the policy of total exclusion of female reporters from the clubhouses at Yankee Stadium ought to be devised", in an affidavit by its counsel. (Cecere affidavit, at ¶ 2.)

■ Defendants have argued that because the City has not explicitly directed the Yankees to adopt the policy in dispute, a finding of state action cannot be made here. The state of the law is otherwise, however. State involvement sufficient to support a finding of state action may be predicated on mere failure to act. "The failure of a city and its public officials to act constitutes state action when the municipality is under a duty to act and the inaction results in the deprivation of constitutional rights." *Citizens Council on Human Relations v. Buffalo Yacht Club,* 438 F.Supp. 316, 323 (W.D.N.Y.1977); *accord, Jennings v. Patterson,* 488 F.2d 436, 441 (5th Cir. 1974).

Thirteen years after *Burton* the Court decided *Gilmore v. City of Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974), another case requiring it to discern the existence of state action underlying apparently private conduct. In *Gilmore* the City of Montgomery, Alabama had established a practice of allowing certain racially segregated schools to use city recreational facilities. Two facets of the Court's *Gilmore* decision are notable for present purposes: (1) the Court declined to follow its more recent decision, *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), relying instead on *Burton (supra)* because the facts of *Gilmore* involved private use of city property whereas *Moose Lodge* involved private use of private property; and (2) the Court indicated that a finding of state action would be supported where the state had made its facilities available to a private party on preferential terms.

The Court's reliance on *Burton,* and rejection of *Moose Lodge* as a basis for deciding *Gilmore* is significant, in that *Moose Lodge* involved private property while *Burton,* like *Gilmore,* involved public property under private use. In the case before us, again as in *Gilmore,* it can readily be seen that the City is allowing a private party to enjoy the use of its facilities on a highly preferential basis. The Court suggested in *Gilmore* that any state involvement at all in making property available for private use would not be sufficient to establish state action. However, the Court further observed that:

> If . . . the city or other governmental entity rations otherwise freely accessible recreational facilities, the case for state action will naturally be stronger than if the facilities are simply available to all comers without reservation. 417 U.S. at 574, 94 S.Ct. at 2426.

The relationship between the City and the Yankees which forms the basis of this action is apparently unique. Indeed, here the City has "rationed" out a highly valuable

public resource to benefit primarily a single user. *See also, Citizens Council on Human Relations v. Buffalo Yacht Club, supra; Cf. Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (state regulation of electric utility insufficient to support finding of state action); *Moose Lodge No. 107 v. Irvis, supra,* (state issuance of liquor license to otherwise private club insufficient to support finding of state action).

Applying the teaching of *Gilmore* to the facts presented here, we reach the conclusion that the many cases involving unsuccessful claims of state action based on state funding, licensing, and/or regulation are inapplicable, despite the contentions of defendants herein to the contrary.[6]

■ The Second Circuit has formulated a five-pronged test for resolving questions of the existence *vel non* of state action in § 1983 cases. *Jackson v. Statler Foundation,* 496 F.2d 623, 629 (2d Cir. 1974). Although the absence of any one of the five factors is not to be deemed preclusive of the existence of state action, the following are to be examined: (1) the private entity's degree of dependence on governmental aid; (2) the extent and intrusiveness of governmental regulation involved; (3) whether or not aid is given to all similar institutions or is suggestive of government's approval of the activity challenged in the particular case; (4) whether or not the institution under attack performs a public function; and (5) the legitimacy of the organization's claim to be regarded as private in character, in associational or constitutional terms.

On the facts of the case at hand, the Yankees are fully dependent on municipal aid insofar as it relates to their ability to occupy the modern and attractive facility which is Yankee Stadium today. As noted above, the City is not without power to regulate some aspects of Yankee affairs (e. g., the power to approve ticket prices) and the operation of the stadium generally (e. g., the power to grant authorizations to other users when not being used by the Yankees).

The circumstances attending the renovation and leasing of the stadium make it clear that, far from being a generally-provided service, the City's lease of the stadium to the Yankees is a unique undertaking. Yankee stadium as a whole is undisputably devoted to a public use, as the New York legislature has recognized, even though the Yankees may not be performing a public function in the strictest sense by operating the stadium. *Compare Evans v. Newton,* 382 U.S. 296, at 301–302, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) and *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). Although it has not been necessary to reach the First Amendment question raised in this case, a recent comment of the Second Circuit in a case involving that Amendment has been found instructive:

> We think that once the press is invited, including the media operating by means of instantaneous picture broadcast, there is a dedication of those premises to public communications use. It is idle to speak of privacy when the affair is publicly transmitted by broadcast to millions of viewers. The issue is not whether the public is or is not generally excluded. *American Broadcasting Companies, Inc. v. Cuomo,* 570 F.2d 1080, 1083 (2d Cir. 1977).

As to the fifth prong of the test, the Court of Appeals for this Circuit has indicated, in a similar context, that an institution's interest in retaining its private character may be outweighed by harm to the public interest flowing from particularly offensive conduct. *Weise v. Syracuse University,* 522 F.2d 397, 407–408 (2d Cir. 1975).

Under applicable decisions of the Second Circuit, a further compelling reason may be found for resolving the instant motion in plaintiffs' favor, since defendants have clearly and unabashedly discriminated

---

6. *Moose Lodge No. 107 v. Irvin, supra; Jackson v. Statler Foundation,* 496 F.2d 623 (2d Cir. 1974); *Grafton v. Brooklyn Law School,* 478 F.2d 1137 (2d Cir. 1973); *Lefcourt v. Legal Aid Society,* 445 F.2d 1150 (2d Cir. 1971); *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1968); *Barrett v. United Hospital,* 376 F.Supp. 791 (S.D.N.Y. 1974), *affirmed,* 506 F.2d 1395.

against plaintiff Ludtke solely on the basis of her sex. For purposes of determining the existence of state action in § 1983 cases, the Second Circuit has stated that a more rigorous test should be applied in situations involving claims other than race discrimination. *Jackson v. Statler Foundation, supra* at 635; *Grafton v. Brooklyn Law School*, 478 F.2d 1137, 1142 (2d Cir. 1973); *Powe v. Miles*, 407 F.2d 73, 82 (2d Cir. 1968). Going further, the Second Circuit has also indicated that a less onerous standard should be applied in at least some cases involving claims of sex-based discrimination. *See Weise v. Syracuse University, supra*, at 406; *compare, Girard v. 94th Street and Fifth Avenue Corp.*, 530 F.2d 66 (2d Cir. 1976), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976).

Three reasons have been articulated for subjecting the state action element of § 1983 claims to differential degrees of scrutiny, depending on the character of the rights alleged to have been infringed. On one hand:

> As the conduct complained of becomes more offensive, and as the nature of the dispute becomes more amenable to resolution by a court, the more appropriate it is to subject the issue to judicial scrutiny. *Weise, supra*, at 406.

Clearly, problems of class-based discrimination have long been recognized as coming well within the sphere of judicial competence. *Id.*

A second rationale for the two tiered analysis applied in these cases was stated in *Powe v. Miles, supra*, to have resulted from:

The particular offensiveness of the state's taxing all citizens for objectives from the benefits of which a particular category is arbitrarily excluded or disadvantaged. 407 F.2d 73 at 82.

Given the extensive involvement of public funds in the renovation and maintenance of Yankee Stadium, this rationale is highly applicable on the facts before this court.

Finally, "in the area of racial discrimination, state inaction or neutrality has often been found to constitute affirmative encouragement." *Lefcourt v. Legal Aid Society*, 445 F.2d 1150, at 1155 n. 6 (2d Cir. 1971). Surely it would be inappropriate for the City to appear to condone the defendants' sex-based policies of exclusion, particularly given the high degree of visibility which members of the media enjoy and the exceedingly high level of public interest in sporting events.

On the basis of *Burton* and *Gilmore* and other authorities reviewed above, this court holds that the Kuhn determination is state action within the contemplation of the Fourteenth Amendment.

B. *Sex Discrimination*

Having found that the Kuhn determination mandating total exclusion of women from the locker room of the Yankee clubhouse constitutes state action, the next question is whether that state action has infringed any right of plaintiff Ludtke which is guaranteed by the Constitution and/or laws of the United States. 42 U.S.C. § 1983. This court finds that the state action complained of here infringes both equal protection and due process rights of plaintiff Ludtke.[7]

---

7. It is difficult to determine in this case, as in many considered by the Supreme Court, whether to apply an equal protection analysis or a due process analysis. See, for example, the Supreme Court's various decisions in *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Califano v. Goldfarb*, 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); and *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974).

It is too plain for argument that this case involves both discrimination against women, solely because they are women, and a substantial interference with the fundamental right of plaintiff Ludtke to pursue her profession as a sports reporter free from unreasonable state regulation. In this case plaintiffs invoke both the equal protection clause of the Fourteenth Amendment and the due process clause of that amendment.

They invoke the equal protection clause to support their claim that the state action complained of here constitutes impermissible discrimination against women. They invoke the due process clause to support their allegation that the state action interferes with plaintiffs' First Amendment right to freedom of the press.

## 1. *Equal Protection*

On the basis of the undisputed facts, plaintiff Ludtke, while in pursuit of her profession as a sports reporter, was treated differently from her male counterparts (other properly accredited sportswriters) solely because she is a woman. Defendants have "controverted", but have not adequately disputed for purposes of Fed.R. Civ.P. 56(e), plaintiffs' allegation that the result of this differentiation was to deny plaintiff Ludtke an equal opportunity to get a story or gather news on the same basis as her male counterparts, thus giving the latter a substantial competitive advantage.

Unless a sufficient justification can be advanced, on these facts and given the involvement of the state in the conduct complained of, the court must hold that plaintiff Ludtke was deprived of equal opportunity to interview ballplayers solely on account of her sex, contrary to the equal protection clause of the Fourteenth Amendment.

"To withstand constitutional challenge . . . classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976). Defendants have asserted, as justification for the complete exclusion of female reporters from the clubhouse at Yankee Stadium, their interest in protecting the privacy of the ballplayers while undressing in the locker room.

The right to privacy is of constitutional dimension, *see, Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and its protection is thus undeniably an important objective. It cannot be said on these facts, however, that there is a sufficiently substantial relationship between that objective on one hand and the total exclusion of women from the Yankee locker room on the other to pass constitutional muster. " 'Inquiry into the actual purposes' of the discrimination * * * proves the contrary." *Califano v. Goldfarb*, 430 U.S. 199, 212, 97 S.Ct. 1021, 1030, 51 L.Ed.2d 270 (1977).

At least during World Series games, male members of the news media with television cameras have been allowed to enter the Yankee locker room immediately after the games and broadcast live from that location. In this connection, only a backdrop behind the player standing in front of the camera is provided to shield other players from the "roving eye" of the camera. These locker room encounters are viewed by mass audiences, which include many women and children. This practice, coupled with defendants' practice of refusing to allow accredited women sports reporters to enter the locker room, shows that the latter is "substantially related" only to maintaining the locker room as an all-male preserve.

This court need look no further than to the statements of defendants' counsel at the hearing on these cross-motions for summary judgment to find a number of alternative approaches which defendants might have implemented that would adequately protect the Yankee players' interests in privacy while at the same time enabling female sportswriters to enjoy precisely the same conditions of employment as their male colleagues.

THE COURT: With respect to the assertion of privacy, at least by some of these players, isn't it possible for them to use curtains in front of this cubicle . . . to undress and hide [themselves] from these women?

MR. CLIMENKO: It's possible, your Honor.

THE COURT: Or put swinging doors if he wants to get behind the door when a woman comes in, he can do that?

MR. CLIMENKO: It's possible. It's possible to do what the plaintiff in this

---

Employing the equal protection analysis employed by the Supreme Court very recently in *Zablocki v. Redhail, supra*, this court would have to hold that the state action complained of here deprives plaintiff Ludtke of equal protection of the laws. Employing the due process analysis of Mr. Justice Stewart concurring in *Zablocki*, the court would also have to conclude that plaintiff Ludtke has been denied due process of law.

case says, wear towels. It's not the way people who play baseball are accustomed to [sic] have the freedom of access after their own game.

If defendants' practice of total exclusion is derived, as counsel would appear to suggest, from a mere "custom", then it surely cannot stand against constitutional attack. The Supreme Court has held that mere administrative convenience cannot justify discrimination on account of sex. *Califano v. Goldfarb*, 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

■ The court holds that defendants' policy of total exclusion of women sports reporters from the locker room at Yankee Stadium is not substantially related to the privacy protection objective and thus deprives plaintiff Ludtke of that equal protection of the laws which is guaranteed her by the Fourteenth Amendment.

### 2. *Due Process*

■ An analysis of these same facts from the perspective of substantive due process leads us to an identical result. The right to pursue one's profession is a fundamental "liberty" within the meaning of the Fourteenth Amendment's due process guarantee. *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1960); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Allgeyer . Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897). Further, it is settled law that:

> Even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

*Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *accord, Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

As noted above, the Kuhn policy substantially and directly interferes with the right of plaintiff Ludtke to pursue her profession as a sports reporter. Her male counterparts are able to get to the ballplayers fresh-off-the-field when comments about plays may still be in progress, for example.

> When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.

*Zablocki, supra*, 434 U.S. 374, at p. 388, 98 S.Ct. 673, at p. 682, 54 L.Ed.2d 618, at p. 631.

■ The undisputed facts show that the Yankees' interest in protecting ballplayer privacy may be fully served by much less sweeping means than that implemented here. The court holds that the state action complained of unreasonably interferes with plaintiff Ludtke's fundamental right to pursue her profession in violation of the due process clause of the Fourteenth Amendment.

■ The other two interests asserted by defendants, maintaining the status of baseball as a family sport and conforming to traditional notions of decency and propriety, are clearly too insubstantial to merit serious consideration. Weighed against plaintiff's right to be free of discrimination based upon her sex, and her fundamental right to pursue her profession, such objectives cannot justify the defendants' policy under the equal protection or due process clauses of the Fourteenth Amendment.

■ Since plaintiff Ludtke has been deprived, under color of the authority of the state, of rights secured to her by both the due process and equal protection clauses of the Fourteenth Amendment to the Federal Constitution, 42 U.S.C. § 1983, she is entitled to the injunctive relief sought and to an award of counsel fees. 42 U.S.C. § 1988.

Having ruled for plaintiffs on Ludtke's § 1983 claim, the court finds it unnecessary to rule on any other federal or state law claim in order to afford plaintiffs all of the relief to which they are presently entitled.

An injunction will therefore issue enjoining defendants from enforcing the policy of total exclusion of accredited women sports reporters from the locker rooms of the clubhouses at Yankee Stadium and requiring them to adopt one of the above alternative means of preserving player privacy.