**WPIX, INC., Plaintiff,**

**v.**

**LEAGUE OF WOMEN VOTERS; League of Women Voters Education Fund; National Broadcasting Company, Inc.; CBS, Inc.; and American Broadcasting Companies, Inc., Defendants.**

**84 Civ. 7263 (ADS).**

United States District Court,
S.D. New York.

Oct. 21, 1984.

would render moot all of the plaintiffs' claims, assuming they had any merit.

Debevoise & Plimpton, New York City, for plaintiff; James C. Goodale, John G. Koeltl, Gary W. Kubek, John S. Kiernan, Warren J. Ingber, New York City, of counsel.

Arnold & Porter, Washington, D.C., and Gilbert, Segall & Young, New York City, for defendants League of Women Voters and League of Women Voters Education Fund; Brooksley Born, David H. Lloyd, Marcia Cranberg, Daniel Waldman, Washington, D.C., of counsel.

Cahill, Gordon & Reindel, New York City, for defendant Nat. Broadcasting Co., Inc.; Dean Ringel, Ellen M. Woodbury, Tracey Maclin, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant CBS Inc.; John E. Beerbower, John Gleeson, Richard M. Breslow, New York City, of counsel.

Hawkins, Delafield & Wood, New York City, for defendant American Broadcasting Companies, Inc.; Thomas W. Pippert, Richard G. Tashjian, New York City, of counsel.

### OPINION AND ORDER

SOFAER, District Judge:

Plaintiff WPIX, Inc., commenced this action against the defendants, the League of Women Voters and the League of Women Voters Education Fund (the "League"), National Broadcasting Company, Inc. ("NBC"), CBS, Inc. ("CBS"), and American Broadcasting Companies, Inc. ("ABC"), alleging violations of WPIX's first and fifth amendment rights, U.S. Const. amends. I and V, and of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982). WPIX seeks injunctive and monetary relief. The only issues before the court on this motion for a preliminary injunction are plaintiff's constitutional claims.

Plaintiff operates a local television station and also produces a daily half-hour national news program which it syndicates through a division of WPIX—Independent Network News ("INN")—to small UHF stations throughout the nation. INN's aim is to provide, through the use of cost-saving techniques for recording events and producing daily news programs, low-cost national news coverage that it claims many of its affiliated stations otherwise could not afford. The League is the sponsor of the 1984 presidential and vice-presidential debates. NBC, CBS, and ABC are the networks providing pooled television coverage of the debates pursuant to an arrangement established by the League.

The League arranged the presidential and vice-presidential debates in 1976, 1980, and again this year. The League provides tickets for the debates to all bona fide media organizations which have sought to have representatives attend. It has concluded, however, that free acess to the debates for television crews would be infeasible. Based on the recommendation of its media consultant, Wallace Westfeldt, who visited the proposed debate sites, and after considering issues of space and security, the League decided to arrange for pooled television coverage.

On September 18, 1984, the League issued a press release notifying the media through the wire services of a meeting it had called for September 19 to discuss television coverage of the debates. The three major networks and several local stations attended the meeting. The League an-

nounced its decision to require pooled coverage. Thereafter, the three major networks and Cable News Network offered to form a pool, and the League accepted their proposal. No other pool proposals were received by the League, and no other organization sought to become a pool member.

On either October 4 or 5, INN first communicated with the League, requesting access for its cameras to the debates, the first of which was scheduled for October 7. John R. Corporon, President of INN, complained in a letter to the League dated October 5: "You have also failed to adopt appropriate pool arrangements that would allow us reasonable access to Sunday night's debate," referring to what INN regarded as the unreasonably high fee set by the pool for access to its "feed." (reprinted as Exh. K to Affidavit of Howard F. Jaeckel (undated)). INN claimed it could record the debate for about $3,000, whereas the pool proposed to charge INN about $15,000 to use pool coverage. INN consented to the pool's plan for the October 7 debate, but "under protest" and without prejudice to enforcing its "legal rights." *Id.* The League denied INN's request, as it had denied the requests of four local stations for access; twenty-seven other television organizations sent camera crews to cover the debate on October 7, but they were restricted to areas outside the auditorium.

On October 9, Corporon sent telegrams to the League, CBS, NBC, and ABC, formally requesting that arrangements be "made immediately" to enable INN to take two ENG cameras into Pennsylvania Hall in Philadelphia to record the vice-presidential debate, scheduled for October 11, and into the Music Hall in Kansas City for the second presidential debate, scheduled for October 21. He added, alternatively: "If INN's ENG cameras are denied access, we formally request that INN be granted access to pool coverage of the debates on a reasonable [financial] basis." (reprinted in *id.*, Exh. L). He warned that, if INN did not receive "the permission we seek by 6:00 P.M. today, we will instruct our attorneys

to bring a lawsuit to obtain such access." *Id.*

Brooksley Born, the League's counsel, replied by telex on October 9. She informed Corporon that the League had decided not to grant INN's request, since the League had concluded that pooled coverage was necessary "because of space limitations ... and considerations stemming from the nature of the event and the identities of the participants ...." (reprinted in Order To Show Cause, Exh. C). She added:

> We understand that you object to the cost of participation in the pool and that that is the basis for your complaint about the pool arrangements. We also understand from those in charge of the pool arrangement that the pool is not requiring payment from Independent Network News prior to participation in the pool and that Independent Network News may reserve its rights to challenge the conditions of its participation in the pool including the amount of the payment it will be required to make. In fact, your letter of October 5, 1984, states that you did reserve all legal rights in participating in the pool for the October 7, 1984, debate.
>
> Under these circumstances, the League believes that you have been granted access to the vice presidential and presidential debates on a reasonable basis.

*Id.*

WPIX commenced this action the next day, October 10, seeking a temporary restraining order prohibiting defendants from denying INN access for its equipment to the 1984 vice-presidential debate that was scheduled for October 11, 1984, and enjoining defendants from denying INN access to the 1984 presidential debate scheduled for October 21, 1984. In a memorandum and order dated October 10, 1984, WPIX's application for preliminary relief was denied with respect to the vice-presidential debate, and expedited discovery and briefing was ordered as to whether preliminary relief would be proper for the final presidential debate. Following substantial

discovery, WPIX now moves for a preliminary injunction prohibiting the League from denying INN reasonable access for two television cameras to cover the final debate.

To obtain a preliminary injunction, WPIX must demonstrate both "(a) irreparable injury, and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward [WPIX]." *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). Furthermore, equitable considerations are important in the determination whether to grant preliminary relief. As Chief Justice Burger has aptly described the principle, "in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973).

Plaintiff contends that it is likely ultimately to prevail on the merits, arguing that "state action" exists sufficient to trigger constitutional safeguards, and that the Constitution guarantees the media not only access, but also equal access, to important public events. *See American Broadcasting Companies v. Cuomo,* 570 F.2d 1080, 1083 (2d Cir.1977); *Cable News Network v. American Broadcasting Companies,* 518 F.Supp. 1238, 1245 (N.D.Ga.1981). WPIX also claims that defendants have failed to make a showing of infeasibility sufficient to justify the exclusion of INN's two cameras from the debate halls. *See Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606–07, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982) (state must show compelling interest and narrowly tailored restriction to justify denial of access to criminal trial); *Sherrill v. Knight,* 569 F.2d 124, 129–30 (D.C.Cir.1977) (refusal of White House press pass to bona fide reporter must be justified by compelling governmental interest, such as protection of the president); *Quad-City Community News Service v. Jebens,* 334 F.Supp. 8, 15 (S.D.Iowa 1971) (selective denial of access to police department records to "underground" paper without showing of compelling state interest is unconstitutional). Finally, plaintiff claims to have established irreparable injury because, absent preliminary relief, INN and its viewing public will be deprived of providing and receiving INN's "unique," "different," and "more candid" news coverage.

## I. The Merits

Two questions must be asked in assessing the merits of plaintiff's first amendment claims. First, does the first amendment apply to the conduct plaintiff challenges? Second, if the first amendment is implicated, does it prohibit defendants from acting as they have done?

■ The League argues that no basis exists for any form of relief, because no state action occurred when "[t]he League decided unilaterally to require pooled coverage of the debate, without any input from the President or former Vice President Mondale or their representatives." League Memorandum in Opposition at 29 (Oct. 18, 1984); *see* Verified Statement of Dorothy S. Ridings ¶ 10 (Oct. 17, 1984). Assuming that the League could prove that its decision to insist on pooled televised coverage was never discussed in 1984 with the candidates or their representatives, that fact alone would fail to establish an absence of state action. The League conducted the presidential and vice-presidential debates during the 1976 and 1980 campaigns. Discussions and decisions in connection with those earlier debates may have established an express or implied understanding that the debates are, as the League claims, appropriate occasions for pooled coverage. Furthermore, the League admits that all its arrangements for the debates are submitted to the candidates and their representatives for discussion and approval; the candidates have effectively approved pooled coverage by accepting that aspect of the League's format. This is evidenced by the candidates' insistence on a condition that reflects their careful consideration of coverage issues—that televised coverage of

audience reactions not be permitted. The League's factual argument is also undercut by its simultaneous assertions as to the public significance of the debates, the real prospect that one or both of the candidates would refuse to proceed if pooled coverage became impossible because of an award of relief in this case, and the "incalculable" injury to the public if the debate does not take place. League Memorandum at 38. The evidence tends at this stage to show that these events are sought by the candidates, and that the candidates have used the League as a politically neutral and organizationally reliable entity through which to arrange their debates, on terms they find acceptable. *See Ludtke v. Kuhn,* 461 F.Supp. 86, 93 (S.D.N.Y.1978) ("symbiotic relationship" between state and private parties creates state action for § 1983 purposes).

The League contends that, irrespective of the degree of candidate involvement in the debate format, cooperation with political candidates does not turn the League's decision regarding pooled coverage into a form of state action. The few reported decisions in cases similar to this one suggest otherwise. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 725, 81 S.Ct. 856, 860, 861, 6 L.Ed.2d 45 (1961) (holding that fourteenth amendment is implicated when state is "a joint participant in the challenged action," and noting that "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance"); *Ludtke,* 461 F.Supp. at 93 (law is "well settled that state action may be found where the direct perpetrator of allegedly discriminatory acts is, though a private entity, so 'entwined' with an agency of the state that that agency must be deemed responsible for the private entity's acts"). In *Jackson v. Statler Foundation,* 496 F.2d 623, 629 (2d Cir. 1974), the Second Circuit provided a checklist of five factors to be considered in determining whether or not "state action," is present:

(1) the degree to which the 'private' organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a 'private' organization in associational or other constitutional terms.

Here, the League is dealing with candidates who include the serving President and Vice President of the United States, as well as with contenders for those offices who are public figures (one a member of the House of Representatives), all of whom are receiving millions of dollars of public support for their campaigns, as well as Secret Service protection mandated by legislation. The public nature of the debates is underscored by the fact that they are broadcast over television in accordance with regulations promulgated by the Federal Election Commission and the Federal Communications Commission. *Cf. Statler Foundation,* 496 F.2d at 629–30 (pervasive governmental regulation of private foundations may render them state actors in some circumstances); *Ludtke,* 461 F.Supp. at 92, 95 (city's power to regulate certain aspects of defendant's use of Yankee Stadium relevant to determining presence of state action in defendant's decision to bar female reporters from locker room). Furthermore, the League has institutionalized its role to a considerable degree, having been selected as organizer of the debates for three successive presidential elections. *Cf. Statler Foundation,* 496 F.2d at 634–35 (governmental officials' participation on private foundation's board may give rise to state action). The League's motivation in sponsoring the debates is not in any sense private, as are the motives of most sporting-event or entertainment promoters. *Cf., e.g., Post-Newsweek Stations-Connecticut v. Travelers Insurance Co.,* 510 F.Supp. 81, 85–86 (D.Conn.1981) (upholding restriction on television coverage of figure-skating contest because state was acting in proprietary capacity in operating rink).

Nor has the League invoked any private property rights to deny access. *Cf. e.g., Le Mistral v. Columbia Broadcasting System*, 61 A.D.2d 491, 402 N.Y.S.2d 815 (1st Dep't 1978) (upholding plaintiff's recovery in trespass suit against defendant's camera crew which filmed restaurant cited for health-code violations), *appeal dismissed*, 46 N.Y.2d 940 (1979); *Stahl v. State*, 665 P.2d 839, 841–42 (Okla.Ct.Crim.App.1983) (newspersons not shielded from trespass prosecution while covering antinuclear power demonstration), *cert. denied*, —— U.S. ——, 104 S.Ct. 973, 79 L.Ed.2d 212 (1984). To the contrary, the League's motivation is purely public and educational, and the property involved is dedicated to "public communications use" during the debates. *Cuomo*, 570 F.2d at 1083.

The fact that the League's decision and role has so direct and substantial a bearing on first amendment interests of the greatest magnitude tends to support a finding of state action in its decisions. *See Statler Foundation*, 496 F.2d at 629, 633 (when government in effect "certif[ies]" that an organization is "laboring in the public interest" this may create state action); *cf. Cuomo*, 570 F.2d at 1083 (once press is invited, premises are dedicated to public communications use); *Ludtke*, 461 F.Supp. at 95 (finding state action and noting that, although the Yankees may not be performing a public function in the strictest sense by operating the stadium, Yankee Stadium as a whole is undisputably devoted to public use). Under these circumstances, plaintiff has raised a substantial possibility that it will be able to prove that the League's decision to deny access to any but the pooled cameras is state action.

 Under the first amendment, press organizations have a limited right of access to newsworthy events in their capacity as representatives of the public and on their own behalf as members of the press. *See Richmond Newspapers, Inc., v. Virginia*, 448 U.S. 555, 580, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1980) (Burger C.J.) (finding that press clause guarantees right to attend criminal trials); *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059 (3d Cir.1984) (extending right of access to civil proceed-

ings); *Westinghouse Broadcasting v. National Transportation Safety Board*, 8 Media L. Rptr. 1177 (D.Mass.1982) (ordering that press be given fuller access to airplane crash site); *Cable News Network*, 518 F.Supp. at 1244 (finding " 'enduring and vital tradition of public entree' (through the press as agents) to presidential activities covered by press pools"). And in order to maximize diversity of coverage, individual newsgatherers also have a limited right of equal access to important public events. *See Cuomo*, 570 F.2d at 1083 ("once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable"); *Cable News Network*, 518 F.Supp. at 1245 (enjoining White House from excluding all television press while admitting members of print media). WPIX's right to equal access under the first amendment is not absolute, however, and the interest to be served by the newsgathering activity at issue must be balanced against the interest served by denial of that activity. *See id.; Borreca v. Fasi*, 369 F.Supp. 906, 909 (D.Hawaii 1974).

Pooling has apparently become a commonplace practice. The vast number of media organizations interested in covering significant public events, and the need for security on many such occasions, make pooling a practical device for permitting press coverage in situations where unregulated access would otherwise permit total exclusion. *See, e.g.,* Wall Street Journal, Oct. 11, 1984, at 10, col. 1 (reporting Pentagon's establishment of pool coverage for military operations). The League's television consultant explained how the concept of pooling works: "Pooled coverage allows every television news organization access to the same pictures and sounds of an event by assigning one organization to cover the event and make its coverage available to all." Verified Statement of Wallace Westfeldt ¶ 10 (Oct. 18, 1984). All groups which wish to use the pool's product share the costs of coverage. *Id.* ¶ 16. In the context of the candidates' debates, al-

though audio-visual coverage of the actual debates was controlled by the pool, the pool "le[ft] in each organization's hands ... the decision whether and to what degree to use that coverage, and how to surround that coverage with commentary, analysis and other programming of its own selection." *Id.* ¶ 10. This pooling procedure was also used for all of the debates in 1976 and 1980. *Id.* ¶ 12. *See also* Ridings Statement ¶ 9 (discussing League's decision to use pool coverage): League Memorandum at 11 (same).

Plaintiff's claim that no feasibility or security problems exist is based on a myopic concern with its own interests. If a ruling in INN's favor led only to two more cameras in the hall, then perhaps one could safely find that access for INN is feasible. But access for INN would inevitably lead to an unknown number of additional requests for access, by a wide variety of press agencies, seeking to bring in numerous pieces of equipment and personnel. *See* Westfeldt Statement ¶ 26 (other organizations would request access); Ridings Statement ¶¶ 12, 16 (other organizations requested access to Louisville debate and would request access to Kansas City event). At this point, all users of the pool—including the pool members—are proceeding on the assumption that no exception will be made to the pooling policy. If the League is required to provide access to INN's cameras, it expects—with good reason—that many other press organizations will promptly seek access, and that future pooling arrangements will face similar last-minute challenges. At oral argument on plaintiff's motion for a temporary restraining order on October 10, counsel for CBS made very clear his client's preference for providing its own coverage, and each of the pool members had previously sought from the League access for its own cameras. The feasibility and security problems that could confront the League if access were permitted to INN are therefore unknown, and hence WPIX cannot conceivably establish, with the degree of certainty required under these circumstances, that those problems can in fact be surmounted.

The constitutional issues posed by pooling are far from exhausted, however, by a record that demonstrates that some form of pooling is necessary. If plaintiff succeeds in proving state action with respect to the League and the networks, then defendants' decisions with respect to who should manage the pool, how it should operate, and the policies and prices it should adopt with respect to media subscribers, would all become potentially subject to judicial scrutiny. While the Supreme Court has held that access by the press or public to public places such as streets and courts can be controlled by reasonable "time, place, and manner" restrictions, *see Richmond Newspapers*, 448 U.S. at 581 n. 18, 100 S.Ct. at 2830 n. 18 (Burger, C.J.), "the question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge ... the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941).

Plaintiff's complaint raises or implies several objections to the manner in which the television pool for the debates has been conducted. First, access has been unnecessarily restricted, plaintiff contends, because space exists for more cameras than are being used by the pool. The debate sites have not required that coverage be restricted to one or two cameras; the Kansas City Music Hall, for example, has room for about twenty cameras, according to the evidence, and CBS intends to use only eleven cameras during the debate. No reason has been advanced at this point as to why it was necessary or appropriate for the major networks to take turns broadcasting the debates, when several broadcasters could have operated simultaneously; and no reason has been suggested as to why the League and networks did not devise a pool in which all the reasonably available camera space could be utilized.

The availability of extra camera space makes possible a greater diversity of coverage, and INN credibly claims to have pur-

poses and techniques distinct from those of the three pool managers. The three networks, pursuant to the League's request, have provided live television coverage of the debates. The networks have apparently proceeded in their customary manner and, at substantial cost, have filmed the event with several large cameras requiring Klieg lights and other arrangements, and transmitted the video from each camera to screens in a trailer or room. There, a director selects, from among the camera shots on the screens, a single camera shot to be televised to viewers through the "feed." The feed is available to all subscribers to the pool, on either a live or recorded basis, but the camera shots not selected for transmission are not preserved in any form.

INN is not interested in broadcasting the debates "live," but wants to have at least two taped perspectives on the debate—filmed by small, inexpensive-to-operate ENG cameras—which it wishes to edit and fashion into a short program that attempts to convey the debates as a news event rather than a performance. INN claims that, because the networks' interests differ from its own, and because they are able to spend more for their programming, the pool "feed" fails to meet INN's needs. INN objects to being charged for access to the "feed" as though it were benefiting equally with the networks from the live coverage that the pool is providing. The difference in cost is potentially significant, since INN claims its ability to reach its subscribers depends on its maintenance of a low-cost operation. Affidavit of John R. Corporon ¶¶ 6–7 (Oct. 10, 1984).

If the pool's limited membership can be justified, the question remains—in light of the presence of several cameras, and the availability of additional camera space—whether the refusal of the League and the pool to provide low-cost film of the debates to INN or other low-budget broadcasters can be justified. The Supreme Court recently reiterated—in a different context, but pertinent in principle to the present situation—that "although the broadcasting industry plainly operates under restraints not imposed upon other media, .... these restrictions have been upheld only when we were satisfied that the restriction is narrowly tailored to further a substantial governmental interest, such as ensuring adequate and balanced coverage of public issues." *FCC v. League of Women Voters,* —— U.S. ——, 104 S.Ct. 3106, 3118, 82 L.Ed.2d 278 (1984) (citation omitted).

These questions of INN's right to limited, if not equal, access are substantial. Few apposite precedents exist, however, let alone any controlling decision; WPIX's likelihood of success on the merits therefore cannot be predicted with substantial confidence. Its claims may fairly be said, however, to present sufficiently serious questions going to the merits to rquire an examination of whether WPIX has established a likelihood of irreparable injury.

## II. Irreparable Injury

The principal claim that WPIX has asserted in its prior dealings with the networks and the League has been its demand for "reasonable" access, which in context has meant access to the pool "feed" at reasonable cost. That claim, though substantial, raises no possibility of irreparable injury. INN has been permitted to order the pool's "feed" for the debates without payment in advance, and monetary compensation can fully offset any excessive fees charged INN by the pool.

WPIX makes a colorable allegation of harm not readily compensable in monetary damages, however, by asserting that denial of access for its cameras would forever deny INN the opportunity to provide its additional and unique coverage of the debate. WPIX claims that network coverage of past debates has been more conservative and less candid than INN's presentation would be, and notes that the networks have not used such techniques as split screens, candidate reaction shots, and close-ups that would record the debate as a news event rather than as a staged presentation. *See* WPIX Guide to Video Tape Submissions (discussing differences between INN and network approaches). WPIX asserts that, by making use of such techniques, INN's

coverage would reveal more of the dynamism and intensity of the debate; in short, that INN would use its own cameras to present its own viewpoint of the debate.

The first amendment interests at stake in this case are not only those of WPIX, but also those of INN's viewing public. The public's interest in access for INN's cameras is limited here to the difference, if any, in the visual perspective that INN will bring to its coverage of the debate. INN is free to participate in the pool coverage, to edit the film with which it is provided—as it has done in covering the first presidential debate—and to exercise its discretion as to what commentary and analysis to provide in conjunction with the visual coverage.

The differences in visual perspective which would be possible if INN were provided greater access may nevertheless be significant. WPIX has provided the court with a videotape to substantiate the asserted differences between INN's news coverage and that of the major networks. The videotape consists of various excerpts of INN's coverage of news events, including the Republican and Democratic Conventions, and reveals that INN places special emphasis on "reaction shots," "candids," and "closeups." John R. Corporon, INN's president, has stated with regard to INN's proposed coverage that INN "would seek to reveal more of the dynamism and intensity of the debate through its editorial use of close-ups, shots of candidate reactions, and other well-recognized recording and production techniques." Affidavit of John R. Corporon ¶ 35 (Oct. 17, 1984). He claims that, by contrast, "the network pool's coverage of the debates has been technically and pictorially conservative in ways that affect the final editorial product." Id.; see also id. at ¶¶ 36–38 (discussing other differences between INN's proposed approach and pool's practices during first two debates). His claim is echoed by Reese Schonfeld, who has had extensive experience in broadcast journalism, and who attests that "INN provides a different perspective" than the networks, with a "more personal perspective," attempting "to convey the point of view of the actual participants in news events." Affidavit of Reese

Schonfeld ¶¶ 3, 4 (Oct. 18, 1984). He feels that the recently televised debates, by contrast, "tended to be presented from a traditional, unimaginative perspective," and he believes that INN would provide more reaction shots, through the split screen and other devices. Id. ¶ 5. He also notes that the different type of coverage provided by INN—an edited version, preferably of at least two tapes—gives the producer "the freedom to make choices," to "edit out shots that do not add information," "to take [artistic] risks," and, in general, to fashion a program of excerpts with the benefits of hindsight judgments and twice as much film. Id. ¶ 6.

The League has responded to INN's presentation by terming its claimed desire to achieve special effects as "inherently incredible," in light of WPIX's consistent prior interest in monetary considerations, and its failure even to send a reporter to the last debate. League Memorandum at 35. The present record also supports the claim of Howard F. Jaeckel, a CBS attorney who serves as that network's liason to the pool, that "INN has never expressed a preference for obtaining independent access to news events for its cameras for the purpose of editorial expression," and "that INN desires access for its own cameras to particular events only when the cost of doing so is less than INN's allocable share of Pool costs for those events." Jaeckel Aff. ¶¶ 6, 14. A fair reading of the record shows, however, that WPIX has also consistently sought physical access, although it has also expressed a willingness to compromise this demand in return for financial concessions. Furthermore, INN has in fact filmed its own programs instead of using the pool when it chose to do so and, despite the skepticism expressed by defense counsel, the results appear to differ significantly in content, style, and viewer impact from more conventional programs on similar subjects.

■ As a general principle, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,*

427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (Brennan, J.). Here, the American public will hear and see the forthcoming debate in full, but INN's perspective could well make a significant difference. Corporon claims—with credence in light of the excerpts of INN's programs—that INN would dwell much more than the pool on "nuances of the candidates' presentations," such as "how various candidates reacted to each other, how President Reagan's energy level was affected as the debate wore on, whether and to what extent Congresswoman Ferraro used handwritten notes, [and] whether Vice President Bush acted patronizingly to Congresswoman Ferraro ...." Corporon Aff. ¶ 36 (Oct. 17, 1984). INN could exercise its constitutionally protected editorial judgment, *see FCC v. League of Women Voters*, 104 S.Ct. at 3115, by freezing specific shots, playing back specific events, and playing in close proximity events that occurred at more widely spaced intervals. With two full tapes of the debate, INN would have much more of an opportunity to find and use evidence of the "nuances" it is so interested in capturing and conveying. These nuances, it seems fair to say, may be as important to potential voters, however misleading they may prove, as the answers the candidates actually speak. The first amendment strongly suggests, if it does not mandate, that no court should find a lack of irreparable injury when a purveyor of news and opinion to the American public is able to make a colorable case that its message will not otherwise be conveyed. *See Cable News Network*, 518 F.Supp. at 1245–46 (finding irreparable injury in exclusion of "unique ... visual element of television" from coverage of White House events).

### III. Equitable Considerations

■ To obtain preliminary relief, plaintiff must also demonstrate that the equities are in its favor. WPIX has failed to meet its burden of showing that an order granting INN's television crews access to the final presidential debate, or any lesser relief that might have enhanced INN's ability to provide its own type of coverage, would be necessary, fair, or workable. *See Lemon v. Kurtzman*, 411 U.S. at 200, 93 S.Ct. at 1469.

The "necessity" for preliminary relief here, although credible, is substantially undercut by WPIX's conduct prior to commencing this litigation. Discovery has revealed that, throughout the several-year history of disputes between WPIX and the networks over pooling practices, WPIX has been primarily, if not exclusively, concerned with the extra cost that pooling imposes on its operation, rather than any purported need for its own filming or editing techniques. *See* Letter from Allen Y. Shaklan (CBS attorney) to John R. Corporon (Oct. 26, 1983) (recounting history of negotiations and disagreement, and unsuccessful efforts of INN and members of pool to arrive at appropriate cost-sharing formula) (reprinted as Exh. A to Jaeckel Aff.); Letter from John R. Corporon to Allen Y. Shaklan (Jan. 24, 1984) (addressing INN's dissatisfaction with network pooling costs and asserting: "I prefer, of course, to continue to use pool information instead of obtaining independent access, but only if that use is the result of a mutually satisfactory—rather than a unilaterally imposed—rate agreement"); Letter from John R. Corporon to Brooksley Born (Oct. 9, 1984) (seeking *either* access for INN's cameras to the vice-presidential debate *or* access to pool coverage of the debate on a reasonable cost basis, once again indicating that WPIX, as recently as October, viewed reasonable access as largely consisting of a reasonable pool fee).

The public interest in seeing INN's special perceptions of the debate remain, but are mitigated here. The public will see the "feed," which in the past has not been devoid of the sorts of techniques on which INN relies. Some close-ups, reaction shots, and angle shots showing both candidates were taken at the last debate, and INN used them effectively to convey the nuances it thought significant. CBS may well be able to provide a more varied set of perspectives with eleven cameras, than with the seven cameras used for the last debate. Finally, the loss to the public is

limited to the single program at issue on this motion; relief as to all future programs remains possible through this litigation.

Considerations of fairness also support a denial of preliminary relief. Prior to commencing this litigation for injunctive relief, INN never informed the League that it demanded physical access to the debates in order to present its unique viewpoint of the event. WPIX's eleventh-hour demand for access has also unjustly burdened the League with the task and expense of responding to a set of difficult legal issues on short notice, and without an appropriate opportunity to work with the candidates' staffs and the pool managers to formulate considered responses to the access demand. INN could have anticipated a denial of access to the debate halls as early as September 19, 1984, the date on which the League announced its decision to require pooled coverage. INN, however, did not attend the League's press conference, did not make any proposals or demands of the League when the pool was formed, and failed entirely to propose any actions short of physical access to enhance its ability to provide its own brand of programming. Moreover, it commenced this litigation on October 9, three weeks after the League announced its plans, and virtually on the eve of the vice-presidential debate, and with less than two weeks before the final presidential debate. INN's unnecessary delay in asserting its rights not only impinges on the League's legitimate interests in security and safety, but also reinforces the conclusion that economic considerations are at the root of WPIX's dispute with the defendants. *See* C. Wright & A. Miller, Federal Practice and Procedure § 2946, at 417 (1973) (" 'equity aids the vigilant, not those who slumber on their rights' "), and cases cited therein. Finally, fairness to the League is an especially important consideration, since it is performing an important public service, from which it should not be deterred by unexpected demands made in last-minute lawsuits.

A grant of access to INN at this stage would also be unfair to other television news organizations that requested access to the debates for their own camera crews, and to those who will do so if INN obtains relief. On this record, no legitimate basis exists for distinguishing INN from numerous other media entities which have sought or are likely to seek permission to cover the debates. Had INN sought relief earlier, others would have been able to obtain an equal opportunity for any relief that might ultimately have been obtained. The candidates must also be considered in this connection. They have carefully negotiated the terms upon which these debates would occur, and a last-minute judicial order might disrupt their legitimate expectations; indeed, as the League suggests, they are free to withdraw, and a change that significantly alters media-coverage ground rules therefore might deprive the public of an important opportunity to evaluate the candidates for this nation's highest office. This in turn would greatly affect the debate's sponsors, who have contributed funds to the League to pay the costs of holding the event. Had this request been timely, these uncertainties also could have been avoided.

Finally, a grant of access for INN might well prove unworkable. As noted above, the feasibility and security problems that would confront the League if access were permitted to INN are unknown. A last-minute judicial order of access could have a potentially disruptive effect on the debate, and on the League's capacity to satisfy the candidates and the Secret Service that proper security measures had been established, and that additional demands or unanticipated forms of coverage would not disrupt the pool's capacity to satisfy established conventions. While the risk of danger or disruption might in reality be very small, in this type of event the perception of risk, or mere uncertainty, can itself prove disruptive. The public importance of this event and of protecting its participants render judicial intervention inappropriate in the face of the uncertainty that exists on this record. The courts simply are not the proper agency for making operational decisions about media coverage.

The workability of awarding equitable relief in this case must also include a consideration of the potential effect of such an order on future relations among media representatives. Media practices such as pooling are best left in the hands of media representatives for resolution. To the extent that a given practice is unlawful, it must of course be prohibited. But the procedure for determining the legality of a practice should enhance, rather than deter, the resolution of such issues through negotiation and mediation, or at least through considered and careful litigation. For courts to award last-minute relief in situations such as this can only encourage disruptive actions by dissatisfied entities, sometimes as a conspicuously selected means of pressure to obtain favorable settlements.

Under these circumstances, an order granting access to INN would be inequitable. Accordingly, plaintiff's application for a preliminary injunction is denied.

SO ORDERED.