Goldie BLANKSTEEN, Plaintiff,

v.

The NEW YORK MERCANTILE EXCHANGE, Defendant.

No. 95 Civ. 1430 (JGK).

United States District Court, S.D. New York.

March 16, 1995.

Kellis E. Parker, New York City, for plaintiff.

Martin I. Kaminsky, Edward T. McDermott and Justin Y.K. Chu, Pollack & Kaminsky, New York City, for defendant.

## OPINION & ORDER

KOELTL, District Judge.

Plaintiff Goldie Blanksteen seeks a preliminary injunction enjoining an election to be held by the defendant New York Mercantile Exchange ("NYMEX") on March 21, 1995 to select the chairman of its board of directors and to select five of the board's member

directors. The NYMEX board consists of a chairman, a vice-chairman, fifteen member directors, and five public directors. NYMEX is a New York not-for-profit corporation, located in the World Trade Center in New York City. Its activities are regulated by the Commodities Futures Trading Commission. The exchange is a market for the trading of futures and options contracts for energy resources and precious metals. The plaintiff is a member of NYMEX by virtue of her ownership of three seats on the exchange. Not wishing to continue her involvement in day-to-day trading and in order to obtain lease income from her seats, she has leased her seats to others. The plaintiff now seeks to challenge the legality of a NYMEX rule that requires a lessor to grant the lessee of a seat the right to vote as a member of the exchange, which results in the plaintiff—having leased all of her seats—having no vote.

The plaintiff, with full knowledge of the rule, chose to lease all of her seats to gain lease income. She could have chosen not to lease her last seat and to retain her right to vote, but she opted to obtain the income. Now, on the eve of an election, she seeks a preliminary injunction to allow her to reclaim her right to vote, while she retains the lease proceeds. For the reasons explained below, the Court denies the motion for a preliminary injunction.

## I.

The complaint alleges that NYMEX's practice and rule requiring the leasing of the right to vote associated with a seat whenever its trading privileges are leased is violative of Section one of the Sherman Act, 15 U.S.C. § 1. Section one of the Act provides in part that, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal ..." The complaint also invokes the protections of the New York Not–For–Profit Corporation Law.

If a member of the exchange leases the trading privileges of a seat, the lessee is entitled to vote. NYMEX represents, and the testimony at the preliminary injunction hearing established, that since the mid–1980's NYMEX Membership Rules have codified the custom and policy of the exchange that lessees must have a vote. Prior to a series of 1991 rule amendments relating to lessee voting, Rule 2.70(A) provided, and continues to provide, that "[A] Member may lease a membership to another Member or to a Member-elect pursuant to an agreement that must be approved by the Membership Committee...." NYMEX Membership Rule 2.70(A). Prior to the 1991 amendments, NYMEX Rule 2.71 provided specific minimum conditions for any lease of a membership, including the condition that, "during the term of the lease, the lessee should be recognized as the Member for all purposes except that the lessor shall be entitled to receive the pro rata share of any distribution of the assets of the Exchange ..." NYMEX Membership Rule 2.71(A)(v) (prior to April 22, 1991 amendment). The plaintiff concedes that NYMEX has had, from at least the mid–1980's, a custom and practice of requiring members to grant the right to vote to the lessee when they lease their seats. The plaintiff alleges however that the harm she has suffered stems from a more recent development of NYMEX policy.

Prior to the 1991 rule amendments, NYMEX members were not allowed to lease their sole or last seat, but were required to hold at least one seat even if they were not actually using it to trade, thus resulting in their retaining the right to vote. In 1991, the rules were amended to permit members to lease their sole seat. See NYMEX Rule 2.73. Rule 2.70(D) was also added in 1991 and provides that a member who leases his or her last or sole membership must lease the right to vote that is associated with that seat and therefore must give up the right.

The plaintiff has put this provision of Rule 2.70 at the center of this case. Rule 2.70(D) provides that "A member who, with respect to his last or sole membership, has leased to another his regular trading privileges shall not be entitled to ... (iii) the right to vote that is set forth in the By–Laws of the Exchange...." NYMEX Rule 2.70(D)(iii). The heart of the plaintiff's complaint is that NYMEX Rule 2.70 unfairly and wrongfully deprives her of her right to vote as a mem-

ber of the exchange and constitutes illegal anticompetitive conduct under the Sherman Act. She also alleges that the lessees should not be allowed to vote, because they do not possess an equity interest in the exchange.

The plaintiff admits that this is the first legal action that she has taken with respect to her complaints about NYMEX's leasing rules. Yet, she has been well-informed as to the nature and effect of those rules for a significant period of time. The defendants have submitted copies of leases executed by the plaintiff dated August 12, 1982, August 12, 1985, July 1, 1990, and February 1, 1993. Each of these lease agreements provides for the lessee to exercise all voting rights pertaining to the membership. Each lease provided substantial monthly fees to the plaintiff. During the time the plaintiff has been leasing her seats, the monthly lease fee that she has obtained per seat has risen from $500 per month to a maximum of $4,000 per month and the value of a NYMEX seat has risen from $25,000 to over $400,000.

## II.

■ On the evening of March 10, 1995, the Court held an evidentiary hearing on the plaintiff's motion for a preliminary injunction enjoining the March 21 election. To prevail on a motion for a preliminary injunction, the party requesting relief must show:

(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994) (quoting *Jackson Dairy v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979)).

■ The plaintiff, relying on cases such as *SEC v. Management Dynamics, Inc.,* 515 F.2d 801 (2d Cir.1975), argues that a showing of irreparable harm is not necessary in this case, because injunctive relief is available pursuant to statute. The plaintiff argues that she therefore need not satisfy the familiar standard that guides the exercise of the Court's equitable discretion in ruling on applications for preliminary injunctions. In

this case, however, the statute that specifically provides for equitable relief is 15 U.S.C. § 26, which declares that:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue....

15 U.S.C. § 26. Section 26 directs the Court to apply traditional equitable principles when granting equitable relief and specifically requires a showing that there is immediate danger of irreparable loss or damage. Consequently, the plaintiff is wrong in arguing that she need not show irreparable harm to be entitled to a preliminary injunction. *See also Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 54 (2d Cir.1979) (using traditional preliminary injunction analysis to review district court's grant of a temporary injunction based on an alleged violation of § 2 of the Sherman Act).

## III.

■ The plaintiff has not demonstrated that she will suffer irreparable harm if she is not able to vote in the March 21, 1995 election. The only harm that she claims she will suffer is simply the harm of not being able to vote in the election due to the allegedly wrongful assignment of her right to vote to the lessee of her last seat pursuant to Rule 2.70. At least two years have passed since she leased her last seat and has been without a vote. The plaintiff does not allege that there is anything different about the upcoming election than others in which she has not voted or that her vote—or indeed the votes of all non-voting members who have leased

their sole or last seat—would likely change the results of the election.

The plaintiff's delay in bringing this action demonstrates that she will not suffer irreparable harm if the election proceeds, she is unable to vote, and she then obtains a judgment in her favor. The plaintiff brought this action less than three weeks before the election although the facts central to the dispute have been fully developed for over two years. At the hearing on the preliminary injunction, counsel for the plaintiff represented he has been engaged by the plaintiff for a year and that the delay was occasioned by his attempts to work out a resolution of the controversy short of litigation. Such efforts do not provide an excuse for waiting to file suit until the eve of an election when ballots have already been printed and the election is about to occur.

Although a lack of diligence, without a showing of resulting prejudice, is not itself sufficient to establish a defense of laches, a lack of diligence will preclude the granting of preliminary injunctive relief to the extent that it is probative of a lack of irreparable harm. *See Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7 (2d Cir.1985); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275–76 (2d Cir.1985) ("Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement") (citation omitted).

In this case, the plaintiff's delay in bringing suit supports a finding that the plaintiff will not suffer irreparable injury. If the plaintiff concluded that she would suffer any irreparable injury, she could have sued at any time over the last two years, and she was certainly capable of suing over the past year when she was being advised by counsel. The plaintiff's delay is probative of a lack of irreparable harm, because it suggests that the plaintiff did not herself view the potential loss of her interest in voting as threatening irreparable harm. Any wrongful loss of the plaintiff's right to vote is not irreparable, because she has not conducted herself as if it were.

Even if the plaintiff could show that the election results would be different if the plaintiff and other non-voting equity members had the right to vote, the plaintiff would nonetheless have an adequate remedy at law, thus further precluding a finding that the plaintiff is threatened with irreparable injury. NYMEX is a not-for-profit corporation and is therefore subject to New York Not-For-Profit Corporation Law § 618, which provides judicial authority to overturn or otherwise modify the results of an improper election:

> Upon the petition of any member aggrieved by an election and upon notice to the persons declared elected thereat, the corporation and such other persons as the court may direct, the supreme court at a special term held within the judicial district where the office of the corporation is located shall forthwith hear the proofs and allegations of the parties, and confirm the election, order a new election, or take such other action as justice may require.

N–PCL § 618 (McKinney's). Under § 618, a petitioner need not show that the election would have produced a different result in his or her favor had its alleged defects been cured, if the election was "so clouded with doubt or tainted with questionable circumstances that standards of fair dealing require the court to order a new, clear and adequate expression" of the voters will. *Faraldo v. Standardbred Owners Ass'n, Inc.*, 63 A.D.2d 1010, 1010, 406 N.Y.S.2d 336, 337 (2d Dep't 1978) (citations omitted). However, in the absence of any appearance of fraud or intentional wrongdoing, courts usually direct new elections only when correction of an alleged grievance would affect the result of the election. *In re Election Officers and Directors of F.I.G.H.T., Inc.*, 79 Misc.2d 655, 360 N.Y.S.2d 564 (N.Y.Sup.Ct. Monroe County 1974); *Burke v. Wiswall*, 193 Misc. 14, 85 N.Y.S.2d 187 (N.Y.Sup.Ct. Ulster County 1948).

In *Bernard v. Local 100, Transp. Workers Union*, 873 F.Supp. 824 (S.D.N.Y.1995), a case involving a union election, this court found that such a statutory remedy precluded a finding of irreparable harm because the plaintiff had an adequate remedy at law.

The Court concluded that, "The plaintiffs have not demonstrated that they will be irreparably injured if the election proceeds.... [I]f it is determined that Bernard should have been a candidate, the union will be required to hold another election." *Bernard,* 873 F.Supp. at 827.

The plaintiff relies on several cases involving corporate takeovers for the proposition that in election cases preliminary injunctive relief is to be preferred over the holding of another election should the plaintiff prevail. *See, e.g., Sonesta Int'l Hotels Corp. v. Wellington Assocs.,* 483 F.2d 247, 250 (2nd Cir. 1973) ("[O]nce the tender offer has been consummated it becomes difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs'") (citations omitted). This is not a case, such as those cited by the plaintiff, where a merger is to be voted on, corporations combined, and the eggs thereafter cannot be unscrambled. Rather, this is a case where there is a specific statutory remedy that allows an election to be held again.

The plaintiff has failed to show an imminent threat of irreparable harm.

## IV.

The plaintiff has not shown either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation. Rather, at this preliminary stage of the litigation, it is the defendant that has shown a substantial likelihood that it will prevail by proving that by limiting the ability of members of the Exchange to lease seats without leasing the right to vote it has not engaged in conduct that violates the Sherman Act.

■ In general, the Sherman Act is to be construed as prohibiting only contracts and combinations that unreasonably restrain trade in interstate commerce. *See Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) (the rule of reason standard). Nonetheless, some practices, such as group boycotts, are illegal per se, regardless of their apparent reasonableness. *See, e.g., Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The plaintiff alleges

that this case involves a group boycott and thus seeks to gain the benefit of the rule of per se illegality. However, the concept of a group boycott cannot be creatively expanded without limit to prohibit any form of collective activity that a plaintiff finds disagreeable to his or her interests. The Court of Appeals for the Second Circuit has instructed that " '[w]hile the boycott concept is infinitely expandable, the per se doctrine ought not to be.' " *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (2d Cir.) (quoting L. Sullivan, *Law of Antitrust* 256 (1977)), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).

In *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), the Supreme Court observed that:

'There is more confusion about the scope and operation of the per se rule against group boycotts than in reference to any other aspect of the per se doctrine.' L. Sullivan, *Law of Antitrust* 229–230 (1977). Some care is therefore necessary in defining the category of concerted refusals to deal that mandate per se condemnation. *See St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 543, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978) (concerted refusals to deal "are not a unitary phenomenon"). *Cf. Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S., [1] at 9, 99 S.Ct. [1551] at 1557 [60 L.Ed.2d 1] [ (1979) ]....

The District Court appears to have followed the correct path of analysis—recognizing that not all concerted refusals to deal should be accorded per se treatment and deciding this one should not.... A plaintiff seeking application of the per se rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive.

*Northwest Wholesale Stationers,* 472 U.S. at 294, 297–298, 105 S.Ct. at 2619–20, 2621–22.

In the present case, it is conceptually difficult to characterize the complained of actions

of the defendant as constituting a group boycott of the plaintiff. This is not a case where NYMEX has expelled the plaintiff, denied her access to any facilities, or urged any member or non-member to deny her access to customers or suppliers. The situation bears none of the characteristics of a group boycott identified by the Supreme Court. *See Id.* at 293–95, 105 S.Ct. at 2619–20. Even if this case were somehow shoehorned into the plaintiff's characterization of a group boycott, it is clear that the defendant's actions do not fall into a category of actions likely to have predominantly anticompetitive effects. Consequently, per se analysis is not warranted. *See Apex Oil Co. v. DiMauro,* 713 F.Supp. 587, 598 (S.D.N.Y.1989) (Walker, J.) ("The Supreme Court has warned that courts should not adjudicate allegations of boycotts under section one of the Sherman Act 'by forcing the [defendant's] policy into the 'boycott' pigeonhole,' particularly where doing so would 'extend per se analysis to restraints imposed in the context of business relationships where the economic impact ... is not immediately obvious'") (citing *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 458–59, 106 S.Ct. 2009, 2017–18, 90 L.Ed.2d 445 (1986)).

In *Cooney v. American Horse Shows Ass'n, Inc.,* 495 F.Supp. 424 (S.D.N.Y.1980), the court found that an alleged group boycott was subject to rule of reason analysis rather than the rule of per se illegality, because the conduct at issue could not be characterized as a naked restraint of trade. The actions of the defendants in this action are similarly outside of the paradigm cases of group boycotts and therefore subject only to rule of reason analysis. Moreover, in *Cooney,* the court noted that in *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the Supreme Court developed an exception from the per se rule for self-regulated industries. *Cooney,* 495 F.Supp. at 431 n. 3; *see Silver,* 373 U.S. at 361, 83 S.Ct. at 1259 (holding that conduct involving self-regulation of an exchange that would otherwise be subject to the rule of per se illegality is to be regarded as legal to the extent that it is necessary to protect the achievement of the ends of the legislation governing the exchange, but that no justifica-

tion exists for self-regulatory, anti-competitive action taken without affording fair procedures). *Silver* also supports application of the rule of reason to this case.

■ Applying the rule of reason, it is apparent that the challenged conduct does not violate the Sherman Act. Rule 2.70 does not have an anticompetitive effect, let alone an unreasonable one, nor is it the product of any unlawful purpose. *See McLain v. Real Estate Bd.,* 444 U.S. 232, 243, 100 S.Ct. 502, 509–10, 62 L.Ed.2d 441 (1980) ("[I]n a civil action under the Sherman Act, liability may be established by proof of either an unlawful purpose or an anticompetitive effect") (citations omitted). The complaint alleges that the plaintiff has been "placed at a great competitive disadvantage in the leasing of her seats on the Exchange," as result of conduct by the defendant characterized thus:

(a) A group boycott to terminate the long-standing membership rights of Plaintiff in the Defendant corporation, such termination being arbitrary, capricious, and unauthorized by, and in derogation of, the bylaws of the Defendant corporation.

(b) To limit the competitive activities of the Plaintiff in the leasing of her seats.

(c) To force Plaintiff to endure an unconscionable cost to lease her final seat on the Exchange.

Complaint ¶ 8. The argument discernible in the complaint, most liberally construed, is that the policy of Rule 2.70 places the plaintiff at a competitive disadvantage with respect to other members of the exchange who do not wish to lease their last seat, because she must bear the "unconscionable cost" of losing the right to vote when she leases her last seat. This argument is without merit. Rule 2.70 does not in any way discriminate against the plaintiff so as to put her at a competitive disadvantage vis a vis other members of the exchange. All members of the exchange must relinquish their right to vote if they lease their last seat. The fact that the plaintiff chooses to maximize her income by leasing all of her seats, whereas other members do not, does not place her at any competitive disadvantage.

The plaintiff has repeatedly complained that the rule is anti-democratic, because it requires members who possess equity interests in the exchange to cede control of the exchange to lessees who have only temporary interests in the exchange's well-being. The rule, of course, did not require the plaintiff to give up her right to vote. She chose to do that when she decided to lease her seat and to accept the lease income with full knowledge of the consequences.

The purpose of the policy of Rule 2.70 appears to be to foster competitiveness rather than to hinder it. The rule reflects a judgment that the competitiveness of the exchange and its democratic character are promoted rather than hindered by rules that provide voting power to those who are active traders on the exchange and that prohibit anyone from voting on the affairs of the exchange who is not involved in the exchange on a day-to-day basis or who is not willing to pay the cost of retaining the ability to be involved. The rule thus ensures that the governance of the exchange will be truly democratic, that those persons who are most immediately involved with the affairs of the exchange have a say in its governance and that those persons who do not will have a say only if they demonstrate the sincerity of their commitment to the interests of the exchange by retaining and not leasing their sole or last seat. By ensuring this form of democracy the rule enhances the competitiveness of the exchange with respect to other exchanges and competitive markets. Those persons who are involved in the day-to-day operation of the exchange are the persons most likely to be informed as to how to increase the competitiveness and efficiency of the exchange.

The plaintiff attempts to argue that under *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the rule at issue here violates Section 1 of the Sherman Act. The argument is baseless. In *Silver*, the Court found that although the Securities Exchange Act provides justification for exempting securities exchanges from the antitrust laws to a limited degree, a securities exchange is not shielded from the antitrust laws when it takes anticompetitive actions without the use of fair procedures. There, the New York Stock Exchange, without explanation, ordered its member firms to remove their private direct telephone lines to two nonmember firms without giving the nonmember firms notice, offering any reason for the action, or affording an opportunity to be heard. *Id.* at 343, 83 S.Ct. at 1249–50. When the principal of the firms sought an explanation, he was repeatedly told that it was the policy of the exchange not to disclose the reasons for such acts. Here, the plaintiff's testimony was clear that she always understood that when she leased a seat, she would be giving the lessee of the seat the right to vote. Even when she leased her last seat, which was in August 1993 according to NYMEX records, she understood that she was giving up her vote and chose to do that. The rules under which she gave up her right to vote and the rule by which she was allowed to lease her final seat were all rules of which she was aware and of which she had ample notice. The plaintiff does not allege that there was any impropriety or unfairness in the procedures by which NYMEX promulgated these rules. There is no plausible argument of procedural unfairness to the plaintiff as there was in *Silver*.

 The defendant also argues that the plaintiff's antitrust claim under § 1 of the Sherman Act is defective on its face, because it is not possible for NYMEX to have unilaterally contracted, combined, or conspired to restrain trade and the complaint does not allege the participation of actors in the complained of conduct other than NYMEX, its members, and its agents. In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court explained:

> The distinction between unilateral and concerted conduct is necessary for a proper understanding of the terms "contract, combination ... or conspiracy" in § 1. Nothing in the literal meaning of those terms excludes coordinated conduct among officers or employees of the same company. But it is perfectly plain that an internal "agreement" to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police.

The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.

*Copperweld,* 467 U.S. at 769, 104 S.Ct. at 2740–41; *see also, Int'l Distribution Centers, Inc. v. Walsh Trucking Co., Inc.,* 812 F.2d 786, 794 n. 5 (2d Cir.) (finding that once individual defendants became members of the same firm, they could not "provide the plurality of actors imperative for a § 1 conspiracy"), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987); *Balaklaw v. Lovell,* 822 F.Supp. 892, 900–02 (N.D.N.Y. 1993) (holding that the complained of conduct was not actionable under § 1 of the Sherman Act, because the parties involved, a hospital, its staff, and its Board of Trustees, were all components of a single entity—the hospital), *aff'd,* 14 F.3d 793 (2d Cir.1994). The foregoing authorities demonstrate that the defendant is likely to be able to ultimately establish a defense to the plaintiff's antitrust claim on the ground that the plaintiff has not sufficiently alleged concerted action. This further reinforces the conclusion that the plaintiff has not shown sufficiently serious questions going to the merits to make them a fair ground for litigation.

The complaint invokes the protections of New York's Not–For–Profit Corporation Law, as well as those of the Sherman Act, but the plaintiff's papers do not demonstrate how New York's Not–For–Profit Law was violated in this case and thus it provides no basis for a preliminary injunction. Even if the plaintiff could demonstrate a likelihood of success on the state law issues, which she has not, she would not have any basis for a preliminary injunction because she has failed to demonstrate a likelihood of success on her federal claim. If the federal claim is dismissed, the state law claims would be subject to dismissal under 28 U.S.C. § 1367(c)(3).[1]

### V.

The Court's findings that the plaintiff has not shown a threat of irreparable harm or the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation are each independently sufficient grounds for denial of the plaintiff's motion for a preliminary injunction. In addition, the balance of the equities tips decidedly against the plaintiff.

The plaintiff was not in any way forced or coerced to lease her last seat and was therefore not forced to give up her right to vote. She chose to lease her last seat in order to gain the revenues of that lease. She disagrees with the policy that requires her to give up her right to vote when she leases her last seat, but the policy itself does not require her to give up the right. It presents her with a choice of either retaining her right to vote by retaining her last seat or giving up her right to vote and gaining the revenues from the lease of her last seat. Blanksteen has chosen the latter. She has thus demonstrated that she values the revenues from the lease of her last seat more highly than she values her right to vote. It would hardly be equitable for the plaintiff to have bargained for a lease which required her to cede her right to vote, to have received the income from that lease, and then to be granted a preliminary injunction to allow her to reclaim the right that she had leased to the lessee.

On the other hand, if the March 21 election were to be enjoined, the defendant would suffer far greater hardship. The defendant represents that the preparations for the election are well under way and that postponing the election would chill the decision making process of the Board and put a harmful cloud over the exchange which could adversely effect not only the exchange itself, but also the international markets in which it is involved. Delaying the election would clearly have significant costs, even if the Board's functioning were not interrupted. Schedules would need to be readjusted and any directors who had planned to leave the board would be required to stay on.

Blanksteen has been an active lessor of NYMEX seats for thirteen years and she has

---

1. Section 1367(c)(3) provides that "the district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

always leased the right to vote to the lessees who have leased from her. Rule 2.70 was adopted four years ago. According to the defendants' records, Blanksteen leased her last seat approximately two years ago. Yet, on the eve of the March 21 election, Blanksteen seeks a preliminary injunction on the basis that she has been wrongfully deprived of her right to vote. The plaintiff's lack of diligence and laches are manifest and require denial of the injunction. Equity should not aid a party who has so demonstrably reaped the benefit of the very policy she is attacking and who waits for the very last moment to challenge it, especially where there would be significant prejudice to the other interested parties. *See WPIX, Inc. v. League of Women Voters,* 595 F.Supp. 1484, 1494 (S.D.N.Y. 1984) (Sofaer, J.) (finding that it would be an inequitable burden on the defendants to grant plaintiff's motion for a preliminary injunction because plaintiff had waited until the last minute to bring suit: " 'equity aids the vigilant not those who slumber on their rights' ") (citing 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2946, at 417 (1973)).

## VI.

The plaintiff's motion for a preliminary injunction is denied for the plaintiff's failure to show irreparable harm, sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships in her favor. The foregoing constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**SO ORDERED.**