Lee A. BALAKLAW, Plaintiff,

v.

Robert M. LOVELL, Wessley D. Stisser, Donald Ames, Joseph Compagni, Jr., Ronald Denniston, Deborah Geibel, James Gibbs, William Greer, David Hempson, David Hunsinger, Bonnie Innerst, David Lundeen, Dean Mitchell, Gene Nacci, Joan Poskanzer, Charles Spaulding, Connie Swarr, Cortland Memorial Hospital, Inc. and the C.M.H. Group, Inc., Defendants.

No. 92–CV–817.

United States District Court, N.D. New York.

May 5, 1993.

As Amended June 2, 1993.

Brown & Seymour, New York City, for plaintiff; Whitney N. Seymour, Jr. and Craig A. Landy, of counsel.

Costello, Cooney & Fearon, Syracuse, NY, for defendants; Frances A. Ciardullo, of counsel.

Mark Thomas, Albany, NY, for Hosp. Ass'n of State of N.Y. (HASNY) as amicus curiae.

Donald R. Moy, Lake Success, NY, for Medical Soc. of the State of N.Y. (MSSNY) as amicus curiae.

Higgins, Roberts, Beyerl & Coan, P.C., Schenectady, NY, for New York State Soc. of Anesthesiologists, Inc. (NYSSA) as amicus curiae; Charles J. Assini, Jr., of counsel.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, District Judge.

### I. Background

Plaintiff Leé A. Balaklaw ("Balaklaw") commenced this action on June 26, 1992. On July 16, 1992, defendant Cortland Memorial Hospital (the "Hospital") moved to dismiss this complaint, and on August 4, 1992, plaintiff moved for a preliminary injunction. Following oral argument on August 28, 1992 in Albany, New York, the Hospital's motion to dismiss was denied and plaintiff's motion for a preliminary injunction was held in abeyance pending a hearing regarding same. This hearing was conducted on October 5 and 6, 1992. Thereafter, in its Memorandum–Decision and Order filed October 16, 1992, 1992 WL 310790, this court denied plaintiff's application for a preliminary injunction based upon the court's determination that the plaintiff failed to demonstrate irreparable harm.

Magistrate Judge Gustave J. DiBianco granted plaintiff's motion to amend his complaint, and on December 11, 1992 Balaklaw filed an amended complaint in this action.

On January 20, 1992, the defendants filed the instant motion for summary judgment on plaintiff's amended complaint. In their motions, the defendants allege that the plaintiff lacks standing to bring this lawsuit and that there is insufficient evidence to support a claimed violation of the Sherman Act. The following day, the plaintiff filed a motion for partial summary judgment on the issue of liability. Oral argument on these motions was heard on February 11, 1992.[1]

### II. The Pleadings

The plaintiff's amended complaint asserts two causes of action under section 1 of the Sherman Act.[2] Balaklaw's first cause of action alleges that the defendants engaged in a group boycott of the plaintiff. His second cause of action alleges that the defendants violated the Sherman antitrust act by entering into an exclusive dealing arrangement whereby the defendants, Dr. Delf O. King ("Dr. King"), and a group of anesthesiologists affiliated with Dr. King (the "King Group") agreed to provide anesthetic and related services to the Hospital. Plaintiff's complaint

---

1. In evaluating the merits of these motions, this court also considered the papers submitted by the Hospital Association of the State of New York, the New York State Society of Anesthesiologists and the Medical Society of the State of New York, which were granted permission to file amicus curiae briefs in this action.

2. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides, in pertinent part:

 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

seeks treble damages, and declaratory and injunctive relief for the "threatened and continued injuries to his business, property, trade and profession caused by the defendants' group boycott and conspiracy to deprive [him] of reasonable, fair, equal and full access to the exercise of professional and clinical staff privileges at CORTLAND MEMORIAL HOSPITAL, INC. and elsewhere...." Amended complaint at ¶ 2.

Defendants deny the principle allegations contained in this complaint, and have interposed six affirmative defenses in their answer. Defendants contend that (i) plaintiff has failed to state a claim upon which relief can be granted under Section 1 of the Sherman Act; (ii) the actions of which the plaintiff complains are not violative of the Sherman Act; (iii) plaintiff has not suffered any antitrust injury within the meaning of Section 1 of the Sherman Act and thereby lacks standing to bring this lawsuit; (iv) the amended complaint alleges insufficient facts to establish a horizontal group boycott and therefore does not state a claim of *per se* violation under Section 1 of the Sherman Act; (v) the decisions and actions of the defendants were in furtherance of legitimate institutional objectives; and (vi) plaintiff is estopped from bringing this lawsuit due to his endorsement of the concept of an exclusive contract for the provision of anesthesia services at the Hospital and his participation in the Request for Proposal process. *See* answer at ¶¶ 38–43.

*III. Discussion*

A. Standard for resolving motions for summary judgment.

Before discussing the merits of the motions before the court, it is instructive to review the standard this court must apply in resolving same.

A court should grant a motion for summary judgment where there exists no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute is not sufficient to defeat a motion for summary

judgment. *Id.* Rather, such a motion may only be defeated if there exists a *genuine* issue of *material* fact. *Id.* at 248, 106 S.Ct. at 2510, 91 L.Ed.2d 202. A material fact is one which might affect the outcome of the case under the governing law. *Id.*

Rule 56 limits the information that the court may consider in making its determination on a summary judgment motion. The court is limited to reviewing the pleadings, affidavits, depositions, answers to interrogatories and admissions on file. Fed.R.Civ.P. 56(c). Additionally, the movant's uncontested assertions in its Local Rule 10(j) statement are deemed admitted for purposes the court's determination on the summary judgment motion. *See* Rule 10(j) of the Local Rules for the Northern District of New York; *Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir.1992).

The initial burden of informing the court of the basis for the motion rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2558, 91 L.Ed.2d 265 (1986). In satisfying this burden, the movant must demonstrate that there is no evidence to support the non-movant's case on which that party bears the burden of proof at trial. *Id. Should the movant satisfy this burden, the burden then shifts to the non-movant to demonstrate the existence of a genuine issue of material fact. The non-movant must make a preliminary showing establishing all elements of its case on which it would bear the burden of proof at trial. Id.* at 322, 106 S.Ct. at 2552, 91 L.Ed.2d 265. The non-movant must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are insufficient to raise genuine issues of fact. To avoid summary judgment, the non-movant must present sufficient evidence such that a jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d 202.

In the context of a claim brought under the Sherman Act, the Supreme Court has held that, to survive a summary judg-

ment motion, a plaintiff "must establish that there is a genuine issue of material fact as to whether the [defendants] entered into an illegal conspiracy that caused [plaintiff] to suffer cognizable injury," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 585–86, 106 S.Ct. at 1355, 89 L.Ed.2d 538, and that such conspiracy resulted in actual "antitrust injury." *Id.* at 586, 106 S.Ct. at 1355, 89 L.Ed.2d 538. Such a conspiracy is not generally susceptible of direct proof, but is generally proven through circumstantial evidence in the form of inferences drawn from the words and conduct of the parties to the alleged agreement and from their course of dealing. *See Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969); *American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1138–39, 90 L.Ed. 1575 (1946). Conduct that may be viewed as either permissible competition or an illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 588, 106 S.Ct. at 1356, 89 L.Ed.2d 538 (citing *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)); *see also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. ——, ——, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992). To survive a motion for summary judgment, a plaintiff must present evidence "that tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 588, 106 S.Ct. at 1356, 89 L.Ed.2d 538 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. at 764, 104 S.Ct. at 1471, 79 L.Ed.2d 775); *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1013 (2d Cir.1989). The plaintiff must proffer direct or circumstantial evidence that reasonably tends to prove a conscious commitment to a common scheme designed to achieve an unlawful objective. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. at 768, 104 S.Ct. at 1473, 79 L.Ed.2d 775; *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Sys., Inc.*, 879 F.2d at 1013.

Before reaching the issue of whether there is a genuine issue of material fact on any of the elements of plaintiff's Sherman Act claim, the court must ascertain whether this plaintiff has standing to bring his antitrust claims.

B. Defendants' motion for summary judgment based upon lack of standing.

 Generally, whether a plaintiff has standing to bring a lawsuit is determined by whether there exists a "case or controversy." *See Flast v. Cohen*, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–53, 20 L.Ed.2d 947 (1968). In the context of an antitrust action, courts must engage in "an analysis of prudential considerations aimed at preserving the effective enforcement of antitrust laws" in determining whether standing exists. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir.1991); *see also Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983).

Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, set forth the remedies available for a claimed violation of the Sherman Act. The relief available through § 16 of the Clayton Act differs from that afforded through § 4.

 A two-pronged test has evolved for the determination of whether a particular plaintiff is the proper party to enforce a claim under Section 4 of the Clayton Act. First, the court must determine whether the plaintiff has suffered actual "antitrust injury" at the hands of the defendant. Second, the court must determine whether the plaintiff is an efficient enforcer of the antitrust laws.[3]

---

**3.** With respect to this second element, there are several factors which a court may consider. These factors include: 1) the potential for duplicative recovery; 2) the existence of more direct victims of the alleged antitrust violation; 3) the directness of the injury; 4) whether the claim for damages rests on some abstract conception or speculative measure of harm; 5) the nature of the plaintiff as a consumer or a competitor in the relevant market; and 6) the causal connection between the asserted antitrust violation and the harm to the plaintiff. *Associated Gen'l Contractors of Calif., Inc. v. California State Council of Carpenters*, 459 U.S. at 537–45, 103 S.Ct. at 908–12, 74 L.Ed.2d 723; *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110, 111 n.

See *Todorov v. DCH Healthcare Auth.*, 921 F.2d at 1449 (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 489 n. 5, 93 L.Ed.2d 427 (1986)); *see also Trepel v. Pontiac Osteopathic Hosp.*, 599 F.Supp. 1484, 1493 (E.D.Mich.1984), *aff'd*, 780 F.2d 1023 (6th Cir.1985). Section 4 of the Clayton Act provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust law" is entitled to treble damages.

■ Under section 16 of this Act, a plaintiff need only establish "threatened" loss or damage, rather than actual loss or damage, in establishing a violation under this section. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. at 111, 107 S.Ct. at 489–90, 93 L.Ed.2d 427. As a result of these differences, the standing requirement for a section 16 claim is somewhat less demanding: courts are less concerned about whether a plaintiff is an efficient enforcer of the antitrust laws. *Todorov v. DCH Healthcare Auth.*, 921 F.2d at 1452. However, as under section 4, for section 16 injunctive relief, a plaintiff still must allege "antitrust injury" (in the form of threatened loss or damage) as well as the defendant's causal responsibility for that injury. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. at 111–13, 107 S.Ct. at 490–91, 93 L.Ed.2d 427. Under section 16 of the Clayton Act, 15 U.S.C. § 26, private parties "threatened [with] loss or damage by a violation of the antitrust laws" may seek injunctive relief.

■ In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, the Supreme Court described antitrust injury as:

[I]njury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. [It] should reflect the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

6, 107 S.Ct. 484, 489, 490 n. 6, 93 L.Ed.2d 427 (1986); *Blue Shield of Va. v. McCready*, 457 U.S. 465, 474–85, 102 S.Ct. 2540, 2545–51, 73 L.Ed.2d 149 (1982); *Eastway Constr. Corp. v.*

*Id.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701; *see also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990). Proof of an unlawful purpose or an anti-competitive effect will satisfy this requirement of antitrust injury due to the fact that competitors may be unable to prove antitrust injury before they are actually driven from the market, thereby lessening competition. *United States v. United States Gypsum Co.*, 438 U.S. 422, 436 n. 13, 98 S.Ct. 2864, 2873 n. 13, 57 L.Ed.2d 854 (1978).

■ Prior to this lawsuit, Balaklaw claims that he had an arrangement with the defendant Hospital whereby he and a group of fellow anesthesiologists would provide anesthesia services to the patients at the Hospital. After a period of time, the Hospital determined that it wished to enter into an exclusive contract with a group of doctors to provide the Hospital with anesthesia services. The Hospital solicited proposals from various physician groups, including a group headed by Balaklaw. A committee consisting of two members of the Board of Trustees, three members of the Medical Staff and two members of the administration of the Hospital interviewed four of these groups, including the group headed by the plaintiff. Since the defendants chose to enter into an exclusive contract for anesthesia services with a group other than one which included the plaintiff, Balaklaw claims he was effectively ousted from his practice at the Hospital.

Defendants contend that Balaklaw does not have standing to assert his claims alleging violations of the antitrust laws because his purported injuries are not "antitrust injuries" as this term has been interpreted by the courts in the context of Sherman Act claims. They claim that Balaklaw was merely a "disappointed competitor" for the subject contract who may not seek redress for his alleged injuries under the antitrust laws. *See generally* Defendants' Memorandum of Law ("Def. Mem.") at 55–57.

*City of New York*, 762 F.2d 243, 250–51 (2d Cir.1985); *Triple M Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242, 247 (2d Cir.1985).

The plaintiff contends that by terminating his *de facto* exclusive contract with the Hospital, the defendants deprived the plaintiff of the opportunity to compete in the relevant market and prevented the plaintiff from competing for the providing of services at the Hospital, thereby causing him antitrust injury. *See* Plaintiff's Memorandum of Law in Support of his Motion for Summary Judgment ("Pl. Mem.") at 46–47.

In considering the injuries and damages alleged by the plaintiff herein and based upon the evidence before the court, the court concludes that such injuries are not of the nature the antitrust laws were intended to prevent. The plaintiff does not claim that the Hospital's ability to enter into exclusive contracts for services violates antitrust laws. Rather, he claims that the manner in which he was ousted from his position at the Hospital and thus precluded from practicing his profession at the Hospital caused him antitrust injury. However, although the plaintiff asserts that defendants' actions have had an anti-competitive impact on Balaklaw, this court, based upon the evidence before it, determines that his allegations of anti-competitive injury are, in reality, merely injury to the plaintiff of a personal nature. While the plaintiff may have an action in tort as a result of the defendants' conduct, not all tort actions are actionable in antitrust. *See, e.g., Robles v. Humana Hosp. Cartersville,* 785 F.Supp. 989, 999 (N.D.Ga.1992) (alleged harm was to individual doctor and not an antitrust injury); *Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc.,* 725 F.Supp. 669, 677 (N.D.N.Y.1989) (plaintiff's radiology practice harmed by defendant's agreement with competitor not an antitrust injury); *Trepel v. Pontiac Osteopathic Hosp.,* 599 F.Supp. at 1493 (causal connection between radiologist's loss of employment at hospital and intentional restraint of trade by hospital not an antitrust injury).[4]

In short, the injury alleged by the plaintiff herein does not appear to this court to be the type of injury the antitrust laws were intended to prevent. Since plaintiff has failed to establish an "antitrust injury" within the meaning of that term, the plaintiff lacks standing to assert the antitrust claims alleged in his complaint and his lawsuit must be dismissed.

However, even if the plaintiff possessed the requisite standing to assert his claims, defendants' motion for summary judgment must nevertheless be granted because the plaintiff has failed to establish the substantive elements of his Sherman Act claims.

**C. Defendants' summary judgment motion based upon grounds that there is insufficient evidence to support a Sherman Act claim.**

▇▇▇ In order to establish a violation of section 1 of the Sherman Act, a plaintiff must prove (1) the existence of a contract, combination or conspiracy among the defendants; and (2) an unreasonable restraint of trade. *Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc.,* 725 F.Supp. at 676 (citation omitted).

**1. Existence of a contract, combination or conspiracy.**

In order to determine whether the plaintiff has sufficiently established that there was a contract, combination or conspiracy between the defendants to deprive Balaklaw of equal and full access to the exercise of professional and clinical staff privileges at the Hospital, this Court must initially review the allegations in Balaklaw's amended complaint. Plaintiff has summarized his assertions regarding the alleged group boycott and exclusive dealing conspiracy in this complaint as follows:

(1) The defendants would invite proposals for an exclusive group anesthesia contract at the HOSPITAL and would rig the selection process to favor KING and his associ-

---

4. The court notes that Balaklaw's allegations regarding the "sham" nature of the due process hearing that was conducted prior to his ouster appear to the court to be more appropriate in the context of a breach of contract or intentional interference with contractual relations action, rather than an antitrust claim. *See, e.g., Chuz v.*

*St. Vincent's Hosp. & Medical Ctr.,* 186 A.D.2d 450, 589 N.Y.S.2d 17 (1st Dep't 1992); *Saha v. Record,* 177 A.D.2d 763, 575 N.Y.S.2d 986, 988 (3d Dep't 1991); *Giannelli v. St. Vincent's Hosp. & Medical Ctr.,* 160 A.D.2d 227, 553 N.Y.S.2d 677 (1st Dep't 1990).

ates and block plaintiff from being the successful applicant. As part of their scheme, defendants would provide secret financial support to co-conspirator KING not offered to plaintiff.

(2) After arranging for the award of the exclusive group anesthesia contract to co-conspirator KING, defendants would then insure that plaintiff ... would not be permitted to continue to practice at the HOSPITAL or elsewhere through the use of sham Medical Staff Bylaw professional review and appeal proceedings to terminate plaintiff's clinical privileges and limit his staff privileges as an attending physician, thereby preventing him from continuing to practice his profession at the HOSPITAL and damaging his ability to obtain hospital credentials elsewhere.

*See* amended complaint at ¶ 40.[5]

The defendants assert that plaintiff's amended complaint has failed to assert a legally or factually cognizable conspiracy among the defendants herein. They contend that the conspiracy alleged by Balaklaw is between the Hospital and its medical staff, which defendants submit are but a single entity, and that a single entity is incapable of conspiring with itself. They also argue that even if this court finds that the antitrust laws do apply to the type of conspiracy alleged by plaintiff, Balaklaw has failed to establish sufficient facts to demonstrate that there existed any agreement, or conspiracy, to oust Balaklaw. *See* Def. Mem. at 24–44.

Plaintiff claims that there is ample evidence of a conspiracy on the part of the defendants to deprive him of his alleged right to exercise professional and clinical staff privileges at the Hospital. Initially, Balaklaw claims that the Hospital and the members of its medical staff conspired together to injure the plaintiff. Secondly, plaintiff alleges that Dr. King and his group entered into a conspiracy with the Hospital to deprive Balaklaw of his rights. Finally, plaintiff contends that the defendants and Dr. King violated antitrust laws by engaging in "conscious parallelism." These arguments will be addressed *seriatim.*

(a) Alleged conspiracy between the Hospital and its staff.

■ Section 1 of the Sherman Act does not reach conduct that is "wholly unilateral." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). Rather, there must be concerted activity, which contemplates the agreement of two or more persons or legal entities. *Brenner v. World Boxing Council,* 675 F.2d 445, 451 (2d Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982).

Thus, a parent corporation is not legally capable of conspiring with its unincorporated division, its wholly-owned subsidiary or its affiliated corporations for antitrust purposes, because they have a complete unity of interest. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. at 771, 778, 104 S.Ct. at 2741, 2745, 81 L.Ed.2d 628; *Cohen v. Primerica Corp.,* 709 F.Supp. 63 (E.D.N.Y.1989). Likewise, officers, directors and employees of a single corporation cannot conspire with each other or with the corporation itself for antitrust purposes. *Id.* at 769, 104 S.Ct. at 2740–41, 81 L.Ed.2d 628; *International Distribution Ctrs., Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 793 n. 5 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987).

In analyzing the allegations in plaintiff's amended complaint concerning the alleged conspiracy between the Hospital and the members of its Medical Staff, the court must determine whether they are separate entities or a single entity incapable of engaging in a conspiratorial violation of the antitrust laws.

The Second Circuit has not yet addressed this issue. In the only case within this circuit which discusses this issue, the district court held that, in the appropriate factual setting, a hospital and members of its medical staff are legally capable of conspiring for Sherman Act purposes. *Purgess v. Sharrock,* 1992 WL 349683 at *6 n. 7 (S.D.N.Y.1992).

Turning to the Circuit law that exists on this issue, there is a split among the courts as to whether a hospital and members of its medical staff are a single entity for purposes

---

5. *See generally* amended complaint, ¶¶ 21–39.

of allegations claiming an antitrust conspiracy.

In *Weiss v. York Hosp.*, 745 F.2d 786, 817 (3d Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985), the Third Circuit held that "even where the medical staff ha[s] economic interests in competition with each other ... the hospital cannot *as a matter of law* conspire with the medical staff." (emphasis added). Similarly, in *Nurse Midwifery Assoc. v. Hibbett,* 918 F.2d 605, 614–15 (6th Cir.), *modified on rehearing,* 927 F.2d 904 (6th Cir.), *cert. denied sub nom. Nurse Midwifery Assoc. v. Hendersonville Community Hosp.,* —— U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991), the Sixth Circuit held that a hospital and its medical staff cannot conspire among one another since they are not competitors. Finally, the Fourth Circuit has held that a hospital is not legally capable of entering into a conspiracy with its medical staff in making peer review decisions. *Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 703–05 (4th Cir.) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992).

However, both the Ninth and Eleventh Circuits have held that a hospital and its medical staff can enter into a conspiracy among one another. *See Oltz v. St. Peter's Community Hosp.,* 861 F.2d 1440, 1450 (9th Cir.1988); *Bolt v. Halifax Hosp. Medical Ctr.,* 891 F.2d 810, 819 (11th Cir.1990), *cert. denied,* 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990).

In considering these conflicting authorities, the court finds that the more persuasive reasoning warrants the determination that a court should not foreclose an antitrust claim of conspiracy on the basis of the professional titles of the alleged conspirators alone, but rather must analyze their roles in relation to one another in the context of the alleged antitrust violation. *See* McDonald, "Antitrust Conspiracies and Hospital Privileges: Keep It Simple or Keep It Stupid," 6 *A.B.A. Antitrust Section's Antitrust Health Care Chron.* 2–16 (1992); *see also Copperweld Corp. v. Independence Corp.,* 467 U.S. at 772–74, 104 S.Ct. at 2742–43, 81 L.Ed.2d 628; *Okusami v. Psychiatric Inst. of Wash., Inc.,* 959 F.2d 1062, 1065 (D.C.Cir.1992); *Pudlo v. Adamski,* 789 F.Supp. 247, 250–51 (N.D.Ill. 1992). Thus, this court must analyze both the structure and the conduct of the Hospital and its medical staff in order to determine whether they could have conspired to act in an anti-competitive fashion.

Cortland hospital has a three-part organizational structure. Its structure consists of the Board of Trustees, the Medical Staff and the Hospital Administration. Defendants' Rule 10(j) Statement at ¶ 5.

The Board of Trustees is the governing body of the Hospital and has overall responsibility regarding the Hospital's operations. It also establishes general institutional policies. The Board insures that the Hospital complies with state and federal laws and regulations and is accountable for the quality of health care services rendered to its patients. *See* Def. Mem. at 1 (citing State Hospital Code, 10 N.Y.C.R.R. § 405.2). Ultimate decisions regarding Medical Staff membership, clinical privileges and services rendered within the institution are made by the Board of Trustees. *See* Def. Mem. at 3; Defendants' Rule 10(j) Statement at ¶ 12.

The Medical Staff consists of both individual physicians and health care professionals. Most of the physicians on the Medical Staff are independent practitioners permitted to use the Hospital's facilities. The Medical Staff is responsible for examining and reviewing the credentials of applicants and current members of the Medical Staff, for monitoring the actions of Medical Staff members, for making recommendations to the Board of Trustees regarding the provision of medical services at the institution, and, where necessary, for recommending "corrective action" that should be taken against an individual practitioner. *See id.* at 3 (citing 10 N.Y.C.R.R. §§ 405.4(a)(2), (3) & (4)). The Medical Staff must account to the Board of Trustees for the quality of care rendered at the Hospital. *See id.* at 2 (citing 10 N.Y.C.R.R. § 405.4(a)). It has its own set of bylaws which are approved by the Board of Trustees. Thus, while it is an independent body within the framework of the Hospital structure, its existence is validated by the Board of Trustees.

The Hospital Administration is the third component of the Hospital's organizational structure. It is currently headed by defendant Robert Lovell, the Chief Executive Officer. He is appointed by the Board of Trustees and is responsible thereto for the day-to-day operations of the facility. *See* Def. Mem. at 2 (citing 10 N.Y.C.R.R. §§ 405.2(d) & 405.-3).

In light of this organizational structure, it appears to the court that Cortland hospital, the Medical Staff and the Board of Trustees are all components that comprise a single entity. Thus, whether this decision was actually made by certain members of the medical staff, Cortland hospital's Board of Trustees, and/or the hospital's administration is irrelevant—these entities comprise only one organization—the Hospital. Thus, irrespective of any anti-competitive purpose or impact that such a decision may have had on the plaintiff herein, such conduct is not actionable under section 1 of the Sherman Act because the decision was "unilateral" and therefore not the product of a conspiracy between two separate groups. *See, e.g., Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. at 761, 104 S.Ct. at 1469, 79 L.Ed.2d 775.

Thus, on the facts before it, this court concludes that the Hospital, its Medical Staff and its members are not separate entities and are therefore not legally capable of entering into a conspiracy in violation of the Sherman Act.

(b) Alleged conspiracy between the defendants, Dr. King and his medical group.

■ The plaintiff also contends that Dr. King and his group were co-conspirators regarding the awarding of the anesthesiologist contract to the King Group, and that the Hospital and/or its Medical Staff conspired with Dr. King and his group to oust plaintiff from his position at the Hospital. *See* Plaintiff's Memorandum of Law in Opposition at 21–29.

Plaintiff makes two general assertions regarding this aspect of his antitrust claim: (i) Dr. King and the defendants conspired to award the exclusive contract to the King Group and not to him; and (ii) Dr. King and the defendants conspired to preclude him membership in the King Group. Balaklaw bases these allegations on the fact that the Hospital and Dr. King entered into the exclusive contract with King's Group—a group in which Balaklaw was denied membership—and a letter written by the Hospital's President and the Chairman of the Board of Trustees which approved of the exclusive contract with the King Group.[6]

Dr. King is an individual separate and apart from the Hospital's infrastructure and, as an anesthesiologist, is plainly a competitor of the plaintiff. However, the evidence proffered by the plaintiff does not tend to exclude the possibility that the defendants and/or Dr. King acted independently by either entering into the exclusive contract at the outset or denying the plaintiff membership in his group. Rather, the testimony heard by this court at the preliminary injunction hearing indicates that the defendants had a legitimate, business reason for entering into the subject contract. The King Group agreed to provide "second call" services for the Hospital—services which were not provided under the agreement that existed between the Hospital and plaintiff's group. Moreover, the plaintiff was reputedly not permitted to join the King Group due to a conflict which exists between the plaintiff and various other members of the King Group, particularly the two certified registered nurse anesthetists, both of whom had previously been associated with the plaintiff. *See* Defendants' Exhibit 14 at

---

**6.** The letter of December 5, 1991 which was jointly signed by Mr. Lovell as Hospital President and Mr. Wesley D. Stisser as Chairman of the Board of Trustees and addressed to the members of the Medical Staff, provided, in part, as follows:

The Board of Trustees, in a specially held meeting on December 3, 1991, approved a resolution that directs the President of the Hospital to elicit proposals from anesthesiologists, both in our community and in a much broader geographic area. The intent of the Board of Trustees is to contract exclusively with one group to provide all anesthesia services at our Hospital....

After the group awarded the exclusive contract is in place, any other anesthesiologists now having privileges at the Hospital will be unable to utilize those privileges to provide anesthesia care at Cortland Memorial....

*See* Exhibit F of the Seymour Declaration.

75. Thus, the facts before the court indicate that the conduct of the defendants was as consistent with permissible competition as with an illegal conspiracy. *See Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. at 764, 104 S.Ct. at 1471, 79 L.Ed.2d 775; *see also Cooper v. Forsyth County Hosp. Auth., Inc.,* 789 F.2d 278 (4th Cir.), *cert. denied,* 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 588, 106 S.Ct. at 1357, 89 L.Ed.2d 538; *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Systems, Inc.,* 879 F.2d at 1006.

(c) Plaintiff's claim of conscious parallelism.

Finally, plaintiff claims that the defendants, Dr. King and the King Group engaged in "conscious parallelism" in violating the alleged rights of the plaintiff.

In the context of an antitrust violation, the doctrine of "conscious parallelism" provides that when two or more competitors act separately but in a parallel fashion, the court can conclude that they acted in a concerted manner. *Todorov v. DCH Healthcare Auth.,* 921 F.2d at 1456 & n. 30. In order to establish such a cause of action, a party must typically prove the existence of certain factors, known as "plus factors," which indicate that the allegedly wrongful conduct of the defendants was conscious, rather than the result of independent business decisions of the parties. *See id.; Theatre Enters. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). Plus factors have been found where the alleged action was contrary to the self-interest of any actor who engaged in the action alone. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538. A plus factor has also been found were a plaintiff has proven a high level of inter-firm communications between allegedly culpable parties. *See Apex Oil Co. v. Di Mauro,* 822 F.2d 246, 254 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). However, the mere presence of one or more of these "plus factors" does not necessarily mandate the conclusion that there was an illegal conspiracy between the parties, for a court may still conclude, based upon the evidence before it, that the defendants acted independently of one another, and not in violation of the antitrust laws. *See Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. at 764, 104 S.Ct. at 1470, 79 L.Ed.2d 775.

Balaklaw contends that the mere fact that the exclusive contract was executed by the parties herein establishes this conspiracy. Plaintiff argues that the Hospital lacked legitimate business reasons for offering financial subsidies to Dr. King and his group. He also claims that the meetings between Dr. King and members of the Hospital's Board of Directors demonstrated a high level of interfirm communications between these parties which violated the antitrust laws.

However, since the Hospital and the King Group are not *competitors,* plaintiff may not prevail on his claim alleging conscious parallelism, which requires uniform business conduct on the part of competitors. *Todorov v. DCH Healthcare Auth.,* 921 F.2d at 1456 ("[c]onscious parallelism is uniform business conduct by competitors that permits a court to infer the existence of a conspiracy between these competitors") (citing *Interstate Circuit, Inc. v. Unites States,* 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939)).

Based upon the foregoing, this Court finds that the plaintiff has failed to establish sufficient evidence of a "contract, combination or conspiracy" on the part of the defendants.

2. Unreasonable restraint of trade.

Even if the plaintiff had demonstrated that there was a conspiracy which violated the antitrust laws, he would still be required to demonstrate that the purpose or effect of the alleged conspiracy constituted an unreasonable restraint of trade resulting in his antitrust injury. *See Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc.,* 791 F.Supp. 956, 964 (1992) (citing *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 133 (2d Cir.1978), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981)). The Supreme Court has fashioned two tests for courts to utilize in determining whether a restraint on competition is "unreasonable"

and therefore violative of the antitrust laws: (A) the *per se* test of illegality; and (B) the "rule of reason" test. *See Arizona v. Maricopa County Medical Soc.,* 457 U.S. 332, 342–44, 102 S.Ct. 2466, 2472–73, 73 L.Ed.2d 48 (1982).

When utilizing the *per se* test of illegality, the court must analyze the nature of the agreement in order to determine whether it always impacts the market in an anti-competitive manner and has no pro-competitive effect whatsoever. *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–63, 60 L.Ed.2d 1 (1979). Under this analysis, a plaintiff may prevail even if he fails to prove market power on the part of the defendants. *FTC v. Superior Trial Lawyers Ass'n,* 493 U.S. 411, 432–36, 110 S.Ct. 768, 780–81, 107 L.Ed.2d 851 (1990). A plaintiff who seeks application of the *per se* analysis must demonstrate that the challenged activity will likely have predominantly anti-competitive effects. *Id.*

With respect to the rule of reason test, in *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, (1918), Justice Brandeis provided the classic discussion regarding this test. He noted that:

> [T]he court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Id.* at 238, 38 S.Ct. at 244, 62 L.Ed. 683; *see also Arizona v. Maricopa County Medical Soc.,* 457 U.S. at 343 n. 13, 102 S.Ct. at 2472

n. 13, 73 L.Ed.2d 48. The rule of reason test requires a case-by-case analysis in which the fact finder weighs all of the evidence before it to determine whether there is an *unreasonable* restraint of trade. *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The fact finder must balance the pro-competitive and anti-competitive effects of any restraint on the market to determine its reasonableness. *United States Football League v. National Football League,* 842 F.2d 1335, 1360 (2d Cir.1988) (citing *National Soc. of Professional Engineers v. United States,* 435 U.S. 679, 691 & n. 17, 98 S.Ct. 1355, 1365 & n. 17, 55 L.Ed.2d 637 (1978)).

Based upon the evidence before it, this court concludes that plaintiff's claims must fail under either the *per se* or the rule of reason tests. Contrary to plaintiff's assertions, the evidence demonstrates that there was a legitimate basis for the change in anesthesia services at the Hospital. The King Group agreed to provide "second call" services for the Hospital—services which were not provided under the "*de facto*" contract that existed between the Hospital, the plaintiff and his group. The Hospital considered the provision of these services to be an important aspect of the subject contract. Thus, the agreement between the King Group and the Hospital did not impact the market in an anti-competitive manner. Rather, it fostered competition by awarding such contract to the organization that offered to provide the services needed by the Hospital at the lowest price. Thus, such conduct was not *per se* illegal.

Turning to the rule of reason test, Balaklaw was required to show that the challenged restraint of trade had an adverse impact upon competition in the relevant market. *Volvo N. Am. Corp. v. Men's Int'l Professional Tennis Council,* 857 F.2d 55, 73 (1988). In the context of an alleged antitrust violation, the relevant market is comprised of the relevant product and geographic markets. *See Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc.,* 791 F.Supp. at 965.

For the purposes of the present motions, this court assumes the relevant product market to be the market requested by Balaklaw, i.e., the job market for anesthesia service positions and the market for anesthesia administered only in connection with operating room services, thus excluding from this market anesthesia services provided in out-patient surgery centers.

■ The relevant geographic market is the geographic area in which there is effective competition in the sale and distribution of particular products or services, and in which persons or entities actually do, or potentially can, compete in the conduct of their business operations. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). In the present case, the relevant geographic market is the area where hospitals compete in offering services to patients or where anesthesiologists compete for positions with such hospitals. *Purgess v. Sharrock*, 1992 WL 349683 at *4 (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984).

■ The plaintiff claims that the relevant geographic market herein includes the cities of Syracuse, Ithaca, Binghamton and Norwich, New York. Plaintiff claims that the Hospital has the majority of the market share for inpatient surgical cases in these cities. *See* amended complaint ¶ 9.

The defendants contend that the relevant geographic market is nationwide because the Hospital's services may be provided on a nationwide basis. *See* Def. Mem. at 50 n. 25, 54.

This court concludes that, insofar as the relevant product market is found to include the job market for anesthesia service positions, the relevant geographic market is nationwide. Indeed, the plaintiff himself raises the specter of a national market for his services in arguing that the actions of the defendants may preclude him from seeking alternative professional employment at any accredited hospital in the United States. *See* amended complaint at 44; Pl. Mem. at 9–10 & n. 3.

Thus, for purposes of plaintiff's antitrust claims, based upon the evidence before it, this court finds the relevant product to be both the job market for anesthesia service positions and the market for anesthesia administered in connection with operating room services only, and the relevant geographic market to be nationwide.

However, there is no evidence before the court which addresses the issue of whether the defendants' actions have foreclosed competition with respect to Balaklaw's employment in these markets. Therefore, this court cannot make any determination on the issue of the reasonableness, or unreasonableness, of the alleged restraint of trade in this case. Were the court not inclined to grant the defendants' motion for summary judgment on the grounds hereinbefore discussed, this court would require additional submissions from the parties on these issues. However, in light of the aforementioned findings, such submissions are not necessary.

D. Plaintiff's motion for partial summary judgment.

In light of the determinations made above, plaintiff's motion for partial summary judgment on the issue of liability is denied.

*IV. Conclusion*

The Court finds the plaintiff lacks the requisite standing to assert the subject claims under the Sherman Act. The Court also finds that there is insufficient evidence of a "contract, combination or conspiracy" on the part of the defendants as required under Section 1 of the Sherman Act. For these reasons, the defendants' motion for summary judgment as to both claims is granted. Additionally, due to the lack of evidence before it, this court is unable to determine whether, in considering the relevant product and geographic area, the defendants' actions constituted an unreasonable restraint of trade. However, in light of the foregoing, further submissions on this aspect of plaintiff's claims are unnecessary.

Plaintiff's motion for partial summary judgment is denied.

**IT IS SO ORDERED.**